David GROBOW, Shelly Kostrinsky, Joyce L. Thomas, Drexel Home, Inc., Adelle Brody, Jerrold Schaffer, Phyllis Greenfogel, Martin Besen, Joseph Lieberman, Blanche Silverberg, Irving Kas, Beatrice L. Russ and Bronson Murray, Plaintiffs Below, Appellants,

v.

H. Ross PEROT, Roger B. Smith, F. James McDonald, Howard H. Kehrl, F. Alan Smith, Donald J. Atwood, Lloyd E. Reuss, Robert C. Stempel, Thomas A. Murphy, Anne L. Armstrong, Catherine B. Cleary, James H. Evans, Walter A. Fallon, Charles T. Fisher III, Marvin L. Goldberger, John J. Horan, Edmund T. Pratt, Jr., James D. Robinson III, John G. Smale, Leon H. Sullivan, Dennis Weatherstone, Thomas H. Wyman, Morton H. Meyerson, J. Thomas Walter, Jr., and William K. Gayden, Defendants Below, Appellees,

and

General Motors Corporation and Electronic Data Systems Corporation, Nominal Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Nov. 3, 1987.
Decided: March 15, 1988.

Klari Neuwelt (argued), Pro Hac Vice, Ellen Chapnick of counsel of Wolf Popper Ross Wolf & Jones, New York City, Joseph Rosenthal, Kevin Gross of Morris & Rosenthal, Wilmington, for appellants.

Stephen C. Neal (argued), Pro Hac Vice, Robert J. Kopecky, Helen E. Witt of Kirkland & Ellis, Chicago, William O. Lamotte, III, Thomas Reed Hunt, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees Gen. Motors Corp. and Electronic Data Systems Corp.

Michael J. Basford, Louis H. Lindeman, Jr. of Gen. Motors Corp., Detroit, of counsel, for appellee Gen. Motors Corp.

Dennis J. Block (argued), Pro Hac Vice, Irwin H. Warren, Stephen A. Radin, Timothy E. Hoeffner of Weil, Gotshal & Manges, New York City, E. Norman Veasey, Thomas A. Beck, Kevin G. Abrams of Richards, Layton & Finger, Wilmington, for Gen. Motors Corp. Director appellees Anne L. Armstrong, Catherine B. Cleary, James H. Evans, Walter A. Fallon, Charles T. Fisher, III, Marvin L. Goldberger, John J. Horan, Howard H. Kehrl, Thomas A. Murphy, Edmund T. Pratt, Jr., Lloyd E. Reuss, James D. Robinson, III, John G. Smale, Leon H. Sullivan, Dennis Weatherstone and Thomas H. Wyman.

Evan R. Chesler (argued), Pro Hac Vice, Thomas D. Barr, Christopher M. Mason of Cravath, Swaine & Moore, New York City, Bruce M. Stargatt, David C. McBride of Young, Conaway, Stargatt & Taylor, Wilmington, Thomas W. Luce, III, M. David Bryant, Jr. of Hughes & Luce, Dallas, for individual appellee H. Ross Perot.

Grover C. Brown, Mary M. Johnston of Morris, James, Hitchens & Williams, Wilmington, Roy L. Reardon, Joseph F. Tringali of Simpson Thacher & Bartlett, New York City, for Gen. Motors Corp. Director appellees Donald J. Atwood, F. James McDonald, Lloyd E. Reuss, F. Alan Smith, Roger B. Smith and Robert C. Stempel.

Before HORSEY, MOORE, Justices, and McNEILLY, Retired Justice.

HORSEY, Justice:

In these consolidated shareholder derivative suits, plaintiffs-shareholders appeal the Court of Chancery's dismissal of their suits for failure of plaintiffs to make pre-suit demand under Court of Chancery Rule 23.1. The Court of Chancery held that plaintiffs' complaints as amended failed to allege particularized facts which, if taken as true, would excuse demand under the demand futility test of *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). The Court interpreted *Aronson*'s "reasonable doubt" standard for establishing demand futility as requiring plaintiffs to plead particularized facts sufficient to sustain "a judicial finding" either of director interest or lack of director independence, or whether the directors exercised proper business judgment in approving the challenged transaction—placing the transaction beyond the protection of the business judgment rule. *Grobow v. Perot,* Del.Ch., 526 A.2d 914, 921 (1987). We find the Vice Chancellor to have erred in formulating an excessive criterion for satisfying *Aronson*'s reasonable doubt test. Moreover, the Vice Chancellor erred in his statement that fairness is a "pivotal" question under an *Aronson* analysis. *See* 526 A.2d at 927. Unless the presumption of the business judgment rule is overcome by the pleadings, questions of fairness play no part in the analysis. *Aronson,* 473 A.2d at 812. However, applying the correct standard, we conclude that the complaints (singly or collectively) fail to state facts which, if taken as true, would create a reasonable doubt either of director disinterest or independence, or that the transaction was other than the product of the Board's valid exercise of business judgment. Therefore, we affirm the decision

below, finding the Court's error to have been harmless.

## I

The well-pleaded facts of these proceedings come principally from the complaints, as amended, and are fully set forth in the Court of Chancery Opinion. *See Grobow*, 526 A.2d 918–20. They will thus be repeated here in summary fashion and only as necessary.

### A.

In 1984, General Motors Corporation ("GM") acquired 100 percent of Electronic Data Systems' ("EDS") stock. Under the terms of the merger, H. Ross Perot, founder, chairman and largest stockholder of EDS, exchanged his EDS stock for GM Class E stock and contingent notes. Perot became GM's largest shareholder, holding 0.8 percent of GM voting stock. Perot was also elected to GM's Board of Directors (the "Board") while remaining chairman of EDS.

The merger proved mutually beneficial to both corporations and was largely a success. However, management differences developed between Perot and the other officers and directors of GM's Board over the way GM was running EDS, and Perot became increasingly vocal in his criticism of GM management. By mid–1986, Perot announced to GM that he could no longer be a "company man." Perot demanded that GM allow him to run EDS as he saw fit or that GM buy him out. Perot then began publicly criticizing GM management with such statements as: "Until you nuke the old GM system, you'll never tap the full potential of your people"; and "GM cannot become a world-class and cost-competitive company simply by throwing technology and money at its problems." Thereafter, GM and American Telephone and Telegraph entered into exploratory negotiations for AT & T's purchase of EDS from GM allegedly as a means of GM's eliminating Perot. However, their negotiations did not proceed beyond the preliminary stage.

By late fall of 1986, Perot, anxious, for tax reasons, for a definitive decision before year-end, offered to sell his entire interest in GM. GM responded with a purchase proposal. Perot replied, suggesting additional terms, which Perot characterized as "a giant premium." When a definitive agreement was reached, the Board designated a three-member Special Review Committee ("SRC"), chaired by one of the Board's outside directors to review its terms.[1] The SRC met on November 30, 1986 to consider the repurchase proposal and unanimously recommended that GM's Board approve its terms. The following day, December 1, 1986, the GM Board of Directors met and approved the repurchase agreement.

Under the terms of the repurchase, GM acquired all of Perot's GM Class E stock and contingent notes and those of his close EDS associates for nearly $745,000,000.[2] GM also received certain commitments, termed "covenants," from Perot. In addition to resigning immediately from GM's Board and as Chairman of EDS, Perot further agreed: (1) to stop criticizing GM management, in default of which Perot agreed to pay GM damages in a liquidated sum of up to $7.5 million;[3] (2) not to purchase GM stock or engage in a proxy con-

1. The complaints fail to state whether the other two directors on the SRC were inside or outside directors. Since plaintiffs do not allege that they were members of management, we will presume that they were outside directors. For purposes of this case, we define "outside" directors to mean nonemployee, nonmanagement directors.

2. "Of the aggregate cost of $742.8 million, $396 million ($33 per share) was attributed to the Class E stock, $282 million ($23.50 per share) was attributed to the contingent notes, and $64.8 million ($5.40 per share) was attributed to

'Special Interest' federal tax compensation under the terms of the contingent notes." *Grobow*, 526 A.2d at 919 n. 6.

3. This commitment by Perot would later be characterized as the "hush mail" feature of the agreement. The colloquial term is not defined in the pleadings but is assumed by this Court to combine the terms "green mail" and "hush money" to connote a variation on an unlawful and secret payment to assure silence. Here, the commitment is cast in the form of an explicit liquidated damage clause for future breach of contract. *See infra* section III B.

test against the Board for five years; and (3) not to compete with EDS for three years or recruit EDS executives for eighteen months.

At all relevant times, a majority of the GM Board of Directors consisted of outside directors. The exact number and composition of the GM Board at the time is not clear. However, from the limited record, it appears that the Board was comprised of twenty-six directors (excluding Perot), of whom eighteen were outside directors.

The GM repurchase came at a time when GM was experiencing financial difficulty and was engaged in cost cutting. Public reaction to the announcement ranged from mixed to adverse. The repurchase was sharply criticized by industry analysts and by members within GM's management ranks as well. The criticism focused on two features of the repurchase: (1) the size of the premium over the then market price of GM class E stock;[4] and (2) the hush mail provision.

### B.

Plaintiffs filed separate derivative actions (later consolidated) against GM, EDS, GM's directors, H. Ross Perot, and three of Perot's EDS associates. The suits collectively allege: (i) that the GM director defendants breached their fiduciary duties to GM and EDS by paying a grossly excessive price for the repurchase of Perot's and the EDS associates' Class E stock of GM; (ii) that the repurchase included a unique hush mail feature to buy not only Perot's resignation, but his silence, and that such a condition lacked any valid business purpose and was a waste of GM assets; and (iii)

that the repurchase was entrenchment motivated and was carried out principally to save GM's Board from further public embarrassment by Perot. The complaints charge the individual defendants with acting out of self-interest and with breaching their duties of loyalty and due care to GM and EDS.

All defendants moved to dismiss the suits for plaintiffs' failure to comply with Court of Chancery Rule 23.1, as construed and applied under *Aronson*—that is, either to make presuit demand on GM's Board or to plead particularized facts demonstrating that demand was excused as futile.[5] Plaintiffs responded that the complaints state a case for demand excusal. They contended that the complaints detail factual allegations that create a reasonable doubt that GM's Board was disinterested or independent, or that the transaction was the product of a valid exercise of business judgment. Defendants dispute the sufficiency of the allegations that GM Board approval of the stock repurchase of dissident Perot was the result of the Board's failure to act in good faith and in the exercise of due care.

As noted the Court of Chancery, finding to the contrary, ruled that plaintiffs had failed to establish demand futility by satisfying *Aronson*'s demand futility test. Plaintiffs seek reversal for error of law and abuse of discretion. Reversible legal error is said to have resulted from the Trial Court's erroneous application of *Aronson* to require a derivative complaint to state particularized facts sufficient to sustain a "judicial finding" of demand excusal. Additionally, plaintiffs argue that the Court

---

**4.** Plaintiffs allege that the total repurchase price per share ($31.375) was double the market price of the GM class E stock on the last day of trading before consummation of the repurchase ($61.90). However, the extent of premium over market cannot be mathematically calculated with any precision without disregarding the value of the contingent notes. The total repurchase price per share includes not only the price paid for the class E stock, but also the price paid for the contingent notes and the value of the special interest federal tax compensation. *See infra* note 7.

**5.** Rule 23.1 provides, in pertinent part:

In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint ... shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort. The action shall not be dismissed or compromised without the approval of the Court. ...

abused its discretion in finding the well-pleaded allegations of the complaints not to establish demand excusal under Rule 23.1.

## II

We first note this Court's standard of review of the Court of Chancery's ruling that plaintiffs have failed to plead a demand-futility case consistent with *Aronson*. Assuming no rule of law is implicated, a decision on a Rule 23.1 motion based on failure to make presuit demand involves essentially a discretionary ruling on a predominantly factual issue. *Aronson*, 473 A.2d at 814–15. Therefore, this Court will disturb the Court of Chancery's Rule 23.1 ruling only on a showing of abuse of discretion, assuming no legal error led to an erroneous holding. *Id.* (the Court's determination of a Rule 23.1 motion is discretionary); *see also Pogostin v. Rice*, Del. Supr., 480 A.2d 619, 624 (1984) (the Court of Chancery, exercising its sound discretion, must determine whether demand is excused under either prong of *Aronson*).

However, before applying our standard of review, we briefly revisit the underlying requirements of a well-pleaded derivative complaint to withstand a Rule 23.1 motion to dismiss for failure to make presuit demand upon a board in accordance with *Aronson* and *Pogostin*. Our standard or test for determining whether a derivative complaint states a demand futility claim under Rule 23.1 is: whether taking the well-pleaded facts as true, the allegations raise a reasonable doubt as to (i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction. *Aronson*, 473 A.2d at 814, and *Pogostin*, 480 A.2d at 624.

Thus, the ultimate question before us is the same as was presented in *Aronson:* whether the complaints, as amended, allege facts with particularity "which create a reasonable doubt that the directors' action was entitled to the protection of the business judgment rule." *Aronson*, 473 A.2d at 808. That is so because "demand futility [in the context of director-approved transactions] is inextricably bound to issues of business judgment" by the power conferred on a board of directors under 8 *Del.C.* § 141(a). *Id.* at 812. Necessarily, this involves an objective analysis of the facts.

Addressing plaintiffs' claim of legal error, we find the Vice Chancellor's use of a "judicial finding" criterion for judging a derivative claim for demand excusal to be erroneous, but not reversible error. First, the Court's "judicial finding" criterion would impose a more stringent standard for demand futility than is warranted under *Aronson*. The test for demand futility should be whether the well-pleaded facts of the particular complaint support a reasonable doubt of business judgment protection, not whether the facts support a judicial finding that the directors' actions are not protected by the business judgment rule. *See Aronson*, 473 A.2d at 815.

Second, given the highly factual nature of the inquiry presented to the Trial Court by a Rule 23.1 defense, we conclude that it would be neither practicable nor wise to attempt to formulate a criterion of general application for determining reasonable doubt. The facts necessary to support a finding of reasonable doubt either of director disinterest or independence, or whether proper business judgment was exercised in the transaction will vary with each case. Reasonable doubt must be decided by the trial court on a case-by-case basis employing an objective analysis. Were we to adopt a standard criterion for resolving a motion to dismiss based on Rule 23.1, the test for demand excusal would, in all likelihood, become rote and inelastic.

Finally, since a Rule 23.1 motion normally precedes rather than follows discovery, a plaintiff may be able in one case and without formal discovery to plead facts sufficient to raise a reasonable doubt of business judgment protection, but be unable in another case without such discovery to plead facts sufficient to support a judicial finding of the lack of business judgment protection. On the other hand, if a derivative complaint alleges facts which would support a judicial finding of a lack of busi-

ness judgment protection, then such facts would more than satisfy *Aronson's* reasonable doubt standard.

■ Therefore, we decline to approve the use of a "judicial finding" standard as the minimum criterion below which presuit demand will not be excused. We think it sufficient simply to say that the Court of Chancery must weigh the presumption of the business judgment rule that attaches to a board of directors' decision against the well-pleaded facts alleged in a plaintiff's demand-futility complaint. In that respect, the suggestion in the Trial Court's Opinion that a transaction is first analyzed from the standpoint of fairness is erroneous. *See* 526 A.2d at 927. Fairness becomes an issue only if the presumption of the business judgment rule is defeated. *Aronson*, 473 A.2d at 812–817.

### III

Although the Vice Chancellor's use of a "judicial finding" criterion and fairness analysis were erroneous, the errors do not require reversal if we, under our review of the pleadings and applying the proper standard of reasonable doubt, conclude that a claim of demand futility has not been pleaded. Thus, we turn to the underlying issue—whether plaintiffs' complaints as amended state a case for demand excusal sufficient to withstand defendant's Rule 23.1 motions to dismiss. The answer to the question requires relating the business judgment rule to the issue of demand excusal.

■ As previously noted, the business judgment rule is but a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest. *See Aronson*, 473 A.2d at 812. Thus, good faith and the absence of self-dealing are threshold requirements for

invoking the rule. *Id.; cf. Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). Assuming the presumptions of director good faith and lack of self-dealing are not rebutted by well-pleaded facts, a shareholder derivative complainant must then allege further facts with particularity which, "taken as true, support a reasonable doubt that the challenged transaction was [in fact] the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 815; *see also Pogostin*, 480 A.2d at 624–25. The complaints as amended do not even purport to plead a claim of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment. *See, e.g., Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971). Therefore, we must presume that the GM directors reached their repurchase decision in good faith. *See Allaun v. Consolidated Oil Co.*, Del.Ch., 147 A. 257, 261 (1929).

■ The burden then clearly falls upon plaintiffs claiming demand futility to plead particularized facts sufficient to rebut the presumption that the GM Board exercised sound business judgment "in the honest belief that the action taken was in the best interest of the company." *Aronson*, 473 A.2d at 812 (citations omitted); *cf. Puma v. Marriott*, Del.Ch., 283 A.2d 693, 695 (1971). Moreover, upon a motion to dismiss, only well-pleaded allegations of fact must be accepted as true; conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true.[6] A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences. Thus, for plaintiffs to meet the *Aronson* reasonable doubt standard, we must examine the complaints, as amended, to determine whether their well-pleaded facts raise a reasonable doubt sufficient to rebut the presumption that the business judgment rule attaches to the repurchase

---

6. Even under the less stringent standard of a Chancery Court Rule 12(b)(6) motion to dismiss, all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true. *See, e.g., Weinberger v. UOP, Inc.*, Del.Ch., 409 A.2d 1262, 1264 (1979); *Cohen v. Mayor of Wilmington*, Del.Ch., 99 A.2d 393, 395 (1953).

transaction. This brings us to the application of the two-pronged demand futility test of *Aronson.*

#### A. *Disinterest and Independence*

 In order to satisfy *Aronson*'s first prong involving director disinterest, *see Aronson,* 473 A.2d at 812, plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment on the part of the GM directors. Plaintiffs plead no facts demonstrating a financial interest on the part of GM's directors. The only averment permitting such an inference is the allegation that all GM's directors are paid for their services as directors. However, such allegations, without more, do not establish any financial interest. *See, e.g., In re E.F. Hutton Banking Practices Litigation,* S.D.N.Y., 634 F.Supp. 265, 271 (1986) (construing Delaware law); *Moran v. Household Internat'l, Inc.,* Del.Ch., 490 A.2d 1059, 1074–75, *aff'd,* Del.Supr., 500 A.2d 1346 (1985).

Having failed to plead financial interest with any particularity, plaintiffs' complaints must raise a reasonable doubt of director disinterest based on entrenchment. Plaintiffs attempt to do so mainly through reliance on *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985); *Unocal,* however, is distinguishable. The enhanced duty of care that the *Unocal* directors were found to be under was triggered by a struggle for corporate control and the inherent presumption of director self-interest associated with such a contest. *See id.* at 954–55. Here there was no outside threat to corporate policy of GM sufficient to raise a *Unocal* issue of whether the directors' response was reasonable to the threat posed. *Id.* at 955.

 Plaintiffs also do not plead any facts tending to show that the GM directors' positions were actually threatened by Perot, who owned only 0.8 percent of GM's voting stock, nor do plaintiffs allege that the repurchase was motivated and reasonably related to the directors' retention of their positions on the Board. *See Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 554 (1964). Plaintiffs merely argue that Perot's public criticism of GM management could cause the directors embarrassment sufficient to lead to their removal from office. Such allegations are tenuous at best and are too speculative to raise a reasonable doubt of director disinterest. Speculation on motives for undertaking corporate action are wholly insufficient to establish a case of demand excusal. *Cf. Sinclair Oil Corp.,* 280 A.2d at 722. Therefore, we agree with the Vice Chancellor that plaintiffs' entrenchment theory is based largely on supposition rather than fact.

Plaintiffs' remaining allegations bearing on the issue of entrenchment are: the rushed nature of the transaction during a period of GM financial difficulty; the giant premium paid; [7] and the criticism (after the fact) of the repurchase by industry analysts and top GM management. Plaintiffs argue that these allegations are sufficient to raise a reasonable doubt of director disinterest. We cannot agree. Not one of the asserted grounds would support a reasonable belief of entrenchment based on director self-interest. The relevance of these averments goes largely to the issue of due care, next discussed. Such allegations are patently insufficient to raise a reasonable doubt as to the ability of the GM Board to act with disinterest. Thus, we find plaintiffs' entrenchment claim to be essentially conclusory and lacking in factual support sufficient to establish excusal based on director interest.

---

**7.** The formula plaintiffs use to establish the existence of a "giant premium" is ambiguous, making the allegation conclusory. The total repurchase price includes not only the price paid for the class E stock, but also the price paid for the contingent notes and the value of the tax compensation. Ambiguity is caused when these items are factored in, especially the contingent note discounts. For example, in their complaints, plaintiffs appear to discount the contingent notes by $16.20, reflecting present value ($62.50–$46.30). The GM directors, however, discount the notes by $6.00. This disparity appears to be due to plaintiffs' use of a base figure of $46.30, which is $16.20 less than that used by the defendants. The plaintiffs fail to explain this disparity with particularity, thus failing to satisfy their burden under *Aronson.*

To otherwise qualify for demand excusal under *Aronson*'s first prong, a derivative complaint must raise a reasonable doubt of director independence. This would require plaintiffs to allege with particularity that the GM directors were dominated or otherwise controlled by an individual or entity interested in the transaction. *Aronson*, 473 A.2d 815–16. Such allegations are not to be found within plaintiffs' complaints. Thus, the plaintiffs cannot satisfy *Aronson*'s first prong for excusal based on lack of director independence.

### B. *Director Due Care*

■ Having concluded that plaintiffs have failed to plead a claim of financial interest or entrenchment sufficient to excuse presuit demand, we examine the complaints as amended to determine whether they raise a reasonable doubt that the directors exercised proper business judgment in the transaction. By proper business judgment we mean both substantive due care (purchase terms), *see Saxe v. Brady*, Del.Ch., 184 A.2d 602, 610 (1962), and procedural due care (an informed decision), *see Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872–73 (1985).

With regard to the nature of the transactions and the terms of repurchase, especially price, plaintiffs allege that the premium paid Perot constituted a *prima facie* waste of GM's assets. Plaintiffs argue that the transaction, on its face, was "so egregious as to be afforded no presumption of business judgment protection." In rejecting this contention, the Vice Chancellor reasoned that, apart from the hush-mail provision, the transaction must be viewed as any other repurchase

> by a corporation, at a premium over market, of its own stock held by a single dissident shareholder or shareholder group at odds with management, [which] have repeatedly been upheld as valid exercises of business judgment. *See Polk v. Good*, Del.Supr., 507 A.2d 531 (1986); *Cheff v. Mathes*, Del.Supr., 199 A.2d 548 (1964); *Edelman v. Phillips Petroleum Co.*, Del.Ch., Civil Action No. 7899, Walsh, V.C. (February 12, 1985) [Available on WESTLAW, 1985 WL 11534];

> *Lewis v. Daum*, Del.Ch., Civil Action No. 6733, Brown, C. (May 24, 1984) [Available on WESTLAW, 1984 WL 8223]; *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556 (1977); *Kors v. Carey*, Del.Ch., 158 A.2d 136 (1960).

*Grobow*, 526 A.2d at 927. We agree with this analysis.

■ The law of Delaware is well established that, in the absence of evidence of fraud or unfairness, a corporation's repurchase of its capital stock at a premium over market from a dissident shareholder is entitled to the protection of the business judgment rule. (See *Polk*, 507 A.2d at 536–37, for this Court's most recent statement of this principle.) We have already determined that plaintiffs have not stated a claim of financial interest or entrenchment as the compelling motive for the repurchase, and it is equally clear that the complaints as amended do not allege a claim of fraud. They allege, at most, a claim of waste based on the assertion that GM's Board paid such a premium for the Perot holdings as to shock the conscience of the ordinary person.

■ Thus, the issue becomes whether the complaints state a claim of waste of assets, i.e., whether "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." *Saxe*, 184 A.2d at 610. By way of reinforcing their claim of waste, plaintiffs seize upon the hush-mail feature of the repurchase as being the motivating reason for the "giant premium" approved by the GM Board. Plaintiffs then argue that buying the silence of a dissident within management constitutes an invalid business purpose. Ergo, plaintiffs argue that a claim of waste of corporate assets evidencing lack of director due care has been well pleaded.

The Vice Chancellor was not persuaded by this reasoning to reach such a conclusion and neither are we. Plaintiffs' assertions by way of argument go well beyond their factual allegations, and it is the latter which are controlling. Plaintiffs' complaints as amended fail to plead with partic-

ularity any facts supporting a conclusion that the primary or motivating purpose of the Board's payment of a "giant premium" for the Perot holdings was to buy Perot's silence rather than simply to buy him out and remove him from GM's management team. To the contrary, plaintiffs themselves state in their complaints as amended several legitimate business purposes for the GM Board's decision to sever its relationship with Perot: (1) the Board's determination that it would be in GM's best interest to retain control over its wholly-owned subsidiary, EDS; and (2) the decision to rid itself of the principal cause of the growing internal policy dispute over EDS' management and direction.

The defendant directors also defend the liquidated damage clause in the repurchase agreement as serving a legitimate purpose of protecting GM's contractual rights by, in effect, providing a forfeiture clause should Perot breach that portion of his agreement. Defendants argue that such a damage clause is not unusual and, indeed, would be expected to be found in contractual commitments of this nature. Such a clause strengthens the likelihood of compliance and, in the event of breach, puts an agreed dollar value on the breach, intended to avoid disagreement (or litigation) over the loss and measure of damages attributable to the breach. A failure to anticipate a breach and to stipulate the monetary consequences to GM might well be considered a costly oversight. *See* E. Farnsworth, *Contracts* § 12.18, at 896 (1982).

In addition to regaining control over the management affairs of EDS, GM also secured, through the complex repurchase agreement, significant covenants from Perot, of which the hush-mail provision was but one of many features and multiple considerations of the repurchase. Quite aside from whatever consideration could be attributed to buying Perot's silence, GM's Board received for the $742.8 million paid: all the class E stock and contingent notes of Perot and his fellow EDS directors; Perot's covenant not to compete or hire EDS employees; his promise not to purchase GM stock or engage in proxy contests; Perot's agreement to stay out of and away

from GM's and EDS' affairs, plus the liquidated damages provision should Perot breach his no-criticism covenant.

Plaintiffs' effort to quantify the size of the premium paid by GM is flawed, as we have already noted, by their inability to place a dollar value on the various promises made by Perot, particularly his covenant not to compete with EDS or to attempt to hire away EDS employees. (*See supra* notes 2, 4, and 7.) Thus, viewing the transaction in its entirety, we must agree with the Court of Chancery that plaintiffs have failed to plead with particularity facts sufficient to create a reasonable doubt that the substantive terms of the repurchase fall within the protection of the business judgment rule. *See Polk*, 507 A.2d at 536–37.

Finally, we turn to the other aspect of director due care, whether plaintiffs have pleaded facts which would support a reasonable belief that the GM Board acted with gross negligence, i.e., that it was uninformed in critical respects in negotiating the terms of the repurchase. *See Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 873 (1985). On this remaining issue, plaintiffs assert that GM's Board failed to exercise due care and to reach an informed business judgment due to the absence of arms-length negotiations between the Board and Perot and the absence of "appropriate board deliberation."

■ Approval of a transaction by a majority of independent, disinterested directors almost always bolsters a presumption that the business judgment rule attaches to transactions approved by a board of directors that are later attacked on grounds of lack of due care. In such cases, a heavy burden falls on a plaintiff to avoid presuit demand. *Cf. Polk*, 507 A.2d at 537 (1986); *Unocal*, 493 A.2d at 955. This principle of law clearly applies in this case.

■ To support their allegation of lack of procedural due care, plaintiffs point principally to the lack of negotiations between Perot and GM and the speed with which the Perot repurchase was submitted to and approved by GM's Board of Di-

rectors. However, we find plaintiffs' complaints as amended (a) to contradict these assertions and (b) otherwise to be lacking in averments essential to raise a reasonable doubt that the GM Board failed to exercise due care.

The complaints implicitly concede that the repurchase agreement was the subject of "give and take" negotiations and was conducted at arms length. Plaintiffs also expressly concede that the Board did not "supinely accede to all of Perot's demands" because all of his demands were not included in the final agreement. *See Grobow,* 526 A.2d at 919 n. 5 and 926. Furthermore, plaintiffs recount that the repurchase proposal was first submitted to a Special Review Committee, consisting (presumably) of three outside directors and thereafter to the full Board. The complaints as amended, however, contain no allegations raising directly or by inference a reasonable doubt either that the Committee served a purposeful role in the review of the repurchase proposal or that the full Board reached an informed decision. On the contrary, it is clear from the record before us that the GM directors had been living with the internal dispute for months and had been considering a buy-out of Perot's interests for a number of weeks.

Viewing plaintiffs' assertions of lack of director due care against the well-pleaded facts, we conclude that the complaints as amended lack essential requirements for stating a claim of waste premised on failure of the directors to exercise due care. *See Smith v. Van Gorkom,* 488 A.2d at 873; *Kaplan v. Centex Corp.,* Del.Ch., 284 A.2d 119, 124 (1971). By way of illustration, plaintiffs do not allege that the Committee failed to: (i) give thorough and diligent consideration to all relevant facts; (ii) review carefully the negotiations leading to the proposed agreement; (iii) consult with and consider the views of investment bankers, accountants, and counsel; or (iv) report its findings and analysis to the full Board. With respect to Board deliberation, plaintiffs do not allege that the Board failed to: (i) inform themselves of available critical information before approving the transaction; (ii) consider expert opinion; (iii) pro-

vide all Board members with adequate and timely notice of the repurchase before the full Board meeting and of its purpose; or (iv) inquire adequately into the reasons for or terms of repurchase (though plaintiffs allege the Board did not ask Perot himself questions). Finally, it should be emphasized that plaintiffs do not allege that the GM directors, and in particular its outside directors, were dominated or controlled by GM's management or other Board members or by any other party. *Aronson,* 473 A.2d 815, 816. Thus, we find plaintiffs' assertion that the GM Board failed to exercise due care to be insufficient to avoid presuit demand because such assertion is not to be found in well-pleaded supporting allegations of the complaints.

## IV. *Conclusion*

Apart from whether the Board of Directors may be subject to criticism for the premium paid Perot and his associates for the repurchase of their entire interest in GM, on the present record the repurchase of dissident Perot's interests can only be viewed legally as representing an exercise of business judgment by the General Motors Board with which a court may not interfere. Only through a considerable stretch of the imagination could one reasonably believe this Board of Directors to be "interested" in a self-dealing sense in Perot's ouster from GM's management. We view a board of directors with a majority of outside directors, such as this Board, as being in the nature of overseers of management. So viewed, the Board's exercise of judgment in resolving an internal rift in management of serious proportions and at the highest executive level should be accorded the protection of the business judgment rule absent well-pleaded averments implicating financial self-interest, entrenchment, or lack of due care. These complaints fall far short of stating a claim for demand excusal.

■ Notwithstanding the Vice Chancellor's misstatement of the test for determining when demand on a board of directors will be considered excused as futile, we

reach the same result. We hold that the complaints as amended fail to allege facts sufficient to create a reasonable doubt that the GM Board-approved repurchase transaction is not within the protection of the business judgment rule; thus, the plaintiffs have failed to establish the futility of demand required under *Aronson* and *Pogostin* for casting reasonable doubt thereon. The Trial Court, therefore, correctly dismissed the suits under Del.Ch.Ct.R. 23.1 for failure of plaintiffs to make presuit demand upon the GM Board.[8]

\* \* \*

Affirmed.

8. Plaintiffs request of this Court leave to amend once again their complaints if we affirm the judgment of the Court of Chancery. Under Court of Chancery Rule 15, a leave to amend is freely granted when justice so requires. However, such a ruling is always a discretionary matter with the trial judge, reviewable on appeal solely for abuse of discretion. *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246, 251 (1970). Since plaintiffs did not file motions to amend in the Chancery Court, no motions are now before this Court. *See* Supr.Ct.R. 8. Plaintiffs' request for leave to amend is, therefore, denied.