Edith CITRON, derivatively on Behalf of
UNITED TECHNOLOGIES CORP.

v.

Robert F. DANIELL, et al.

v.

UNITED TECHNOLOGIES CORP.

John P. DECKER, derivatively on
Behalf of UNITED TECH-
NOLOGIES CORP.

v.

Robert DANIELL, et al.

v.

UNITED TECHNOLOGIES CORP.

Nos. 2:91cv00591 (PCD),
2:91cv00689 (PCD).

United States District Court,
D. Connecticut.

June 26, 1992.

J. Daniel Sagarin, Elias A. Alexiades, Hurowitz & Sagarin, Milford, Conn., Daniel J. Bershad, Milberg, Weiss, Bershad, Specthrie Lerach, New York City, for Citron.

Kenneth A. Jacobsen, Francis J. Farina, Greenfield & Chemicles, Haverford, Pa., for Decker.

Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., Bernard W. Nussbaum, Laurence B. Pedowtiz, Stephen R. Neuwerth, Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

## RULING ON MOTIONS TO DISMISS

DORSEY, District Judge.

Plaintiffs' consolidated shareholder derivative actions, on behalf of United Technologies Corporation ("UT"), a nominal defendant, allege that UT's directors and officers ("defendants") have fraudulently sought to obtain and retain United States defense contracts.[1] Plaintiffs claim defendants violated the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), 18 U.S.C. § 1961, *et seq.;* Section 14 of the Securities Exchange Act of 1934 (the Exchange Act"), 15 U.S.C. § 78n(a) and Rule 14a–9 promulgated thereunder;[2] and Section 20 of the Exchange Act, 15 U.S.C. § 78t.[3] Defendants move to dismiss.

*Background and Facts*

The facts alleged are accepted as true for the purpose of this motion. UT designs and manufactures commercial and military jet engines, among other things. Pratt & Whitney ("P & W"), a leading producer of large turbofan (jet) engines and parts for commercial aircraft, and Norden, which produces radar, electronic systems, and antisubmarine warfare systems for the United States and foreign governments, are two of UT's "industry segments."

"For several years, defendants have knowingly or recklessly caused UT to unlawfully extend bribes, monies and other gratuities to government officials and industry consultants in return for classified confidential information and favorable consideration and treatment in the procurement of defense contracts and awards." Complaint at ¶ 3. The complaints describe three specific "allegations of wrongdoing." First, plaintiffs claim that a "UT official" paid $218,453.29 to Melvyn R. Paisley, former Assistant Secretary of the United States Navy for Research, Engineering and

---

1. The two complaints are identical except for the addition of two sentences in the second complaint.

2. Plaintiffs' Section 14 claim is brought both derivatively, in Count Two, and as a class action claim in Count Three.

3. Plaintiffs also allege several state law claims.

Systems, for confidential information which Paisley "stole" from the government before resigning from the Navy. *Id.* at ¶¶ 32–43. Using this information, UT was able to procure a government contract for the manufacture of the F404 engine, for which it had been competing with General Electric. *Id.* Paisley eventually pled guilty in United States District Court for the Eastern District of Virginia, to a charge of conversion of government property, in connection with this scheme. *Id.* at 44.

Second, the complaint alleges that Robert K. Engel, a former general Norden manager, recommended that Norden hire Thomas Muldoon, a consultant, to obtain classified information on Norden's progress in a competition for a $100 million Marine Corps communications contract. *Id.* at 46. Norden dropped out of the bidding when the Justice Department's investigation of procurement fraud, known as "Operation Ill Wind," became public in June 1988, "although Norden ultimately benefitted from information provided through the conspiracy." *Id.* Engel and "two other Norden executives" were convicted for their roles in this "influence-peddling" scheme. *Id.*

Third, plaintiffs allege that, "for several years, defendants have engaged in a pervasive pattern of fraudulent conduct causing or permitting UT to artificially inflate labor and cost data and overcharge the United States Government on large defense-related contracts." *Id.* at 47. This conduct has "caused law enforcement authorities to engage in extensive investigations which has caused the disruption of UT's normal business operations and the loss of goodwill through damage to its business reputation." *Id.* at 49. Moreover, UT's assets have allegedly not been reasonably safeguarded against misuse because defendants have caused UT to maintain inadequate internal financial and accounting controls, in order to facilitate and conceal their wrongdoing. *Id.*

Plaintiffs' prayer for relief would require defendants to pay UT three times the company's damages resulting from the conduct complained of, a return of defendants' salaries and other remuneration, and removal of defendants from office. Defendants move to dismiss the derivative claims on the ground that plaintiffs failed to make a pre-suit demand on the board, which failure was not justified, and for failure to state a claim. Defendants move to dismiss the class action claim for failure to state a claim.

*Discussion*

Motions to dismiss are granted only where the complaint fails to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). *Fischman v. Blue Cross/Blue Shield of Connecticut,* 755 F.Supp. 528, 530 (D.Conn.1990), states the standard of review.

### I. Derivative Claims

Before a shareholder may seek to litigate claims that rightly belong to the corporation, a shareholder must first make a "demand" on the board to commence suit. *Kamen v. Kemper Fin. Serv., Inc.,* —— U.S. ——, 111 S.Ct. 1711, 1719 n. 7, 114 L.Ed.2d 152 (1991). The purpose behind pre-suit demand is "to allow the directors the chance to occupy their normal status as conductors of the corporation's affairs." *Lewis v. Graves,* 701 F.2d 245, 247 (2d Cir.1983). The law defining when demand is excused is the law of the state where the defendant company is incorporated. *Kamen,* 111 S.Ct. at 1719. As UT is incorporated in Delaware, Delaware law governs. Under Delaware law, demand is excused only where such demand would be "futile." *E.g., Aronson v. Lewis,* 473 A.2d 805 (Del. 1984). Demand is "futile" if "taking the well-pleaded facts as true, the allegations raise a reasonable doubt as to (i) director disinterest or independence or (ii) ... the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* 539 A.2d 180 (Del. 1988).

Rule 23.1, Fed.R.Civ.P., provides:

In a derivative action brought by one or more shareholders ... the complaint shall ... allege ... with particularity the efforts, if any, made by the plaintiff to

obtain the action the plaintiff desires from the directors ... and, if necessary, the reasons ... for not making the effort.

Conclusory allegations that the directors are not disinterested or independent will not suffice. *Grobow,* 539 A.2d at 188. A shareholder must plead particularized facts demonstrating a financial interest—other than merely receiving a salary or compensation—on the part of the directors. *Id.* Allegations that the directors engaged in the conduct at issue in order to retain their positions is likewise insufficient to establish futility. *Lewis,* 701 F.2d at 250; *Tabas v. Mullane,* 608 F.Supp. 759, 766 (D.N.J. 1985).

■ Plaintiffs claim defendants may not rely on the business judgment rule and thus pre-suit demand was not necessary, because all directors are alleged to have engaged in active pervasive fraudulent conduct. Alternatively, they argue demand is excused because defendants were grossly negligent in not knowing of the fraud. Moreover, they claim defendants acted in "bad faith" in issuing materially false and misleading proxy statements. According to plaintiffs, reasonable doubt exists as to whether the directors were disinterested because (a) defendant Daniell and other non-officer directors were receiving compensation from UT; (b) "many of the director defendants" have "entangling business and personal relationships between themselves and/or UT" i.e. several directors sit on the same boards of other companies; (c) several directors are affiliated with law firms which perform legal services for the company; and (d) several directors previously served in various capacities for the United States Government from which UT derives substantial revenue.

All of the allegations of defendants' wrongdoing are conclusory in nature. Allegedly, the directors "participated" in the violations, *see* Complaint at ¶¶ 1, 17, "engaged" in illegal, fraudulent conduct, *id.* at ¶ 2, "caused" the bribery and purloining of information, *id.* at ¶ 3, and "engaged" in a pattern of illegal practices. *Id.* at ¶ 5.

They allegedly caused false proxy statements to be sent to shareholders in order to retain their positions and obtain insulation from liability. *Id.* at ¶¶ 5–6. Responsibility is charged in terms of control, *id.* at ¶ 18, aiding and abetting, *id.* at ¶ 19, and conspiracy. The claims of futility are similarly couched, specifying the audit committee's and defendant Daniell's opportunities to detect and correct the improprieties; the lack of detachment in unspecified directors by reason of personal economic ties and relations with UT; the motivation to conceal the wrongful activities in order to preserve their positions and income from UT, the affiliation of some directors with government agencies from or in relation to which some of the improprieties arose; and the fact of actual fraud.

The specific wrongdoing, *see id.* at ¶¶ 23–50, is not stated as acts of any of defendants. Plaintiffs' theories of entitlement to recover recited in Counts One through Four do not add to the specification.

Plaintiffs argue that they have not limited their claims to mere passive involvement nor negligence, but they have not particularized any specific personally-committed acts nor direct and immediate involvement on the part of the directors from which it can be found that there is reasonable doubt as to the ability and willingness of the directors to act on a demand. *See Allison v. General Motors Corp.,* 604 F.Supp. 1106, 1113 (D.Del.), *aff'd without opinion,* 782 F.2d 1026 (3d Cir.1985). Even treating the claims as true, except for the conclusory claims which stand on a different footing, absent specific underlying allegations which substantiate the conclusions, *Grobow,* 539 A.2d at 187; *see Lewis,* 701 F.2d at 249, plaintiff has not created a reasonable doubt that the directors, in response to a demand, would not comport their conduct to the law and in proper protection of the interests of the corporation and the shareholders. *Mozes v. Welch,* 638 F.Supp. 215, 220 (D.Conn.1986). Plaintiffs attempt to justify their failure to make a demand by pointing out, for example, that certain directors were former government employees. They fail to describe, however, how such former association would prevent

them from exercising reasonable independent decision making with respect to the best interest of the company. Although plaintiffs do state that defendants had an incentive to conceal the fraud because they received a salary and hoped to maintain their positions on the board, such incentives are insufficient, as noted above, to excuse demand. Nor do the allegations show such dominance of a majority of the board as to substantiate the requisite reasonable doubt in rebuttal of the business judgment rule. *See Levine v. Smith,* 591 A.2d 194, 206 (Del.1991).

■ Plaintiffs' alternative claim of excuse, an asserted showing of gross negligence on the part of the directors, is similarly deficient. All of the allegations of serious misconduct on the part of the directors are stated conclusorily, without specification of particular personal acts or conduct to sustain the asserted conclusions. No where, for example, is it alleged that any of the directors knew, in advance, of the actual misdeeds of the UT employees, directed that they be carried out, planned, or joined in their planning. Thus, the complaint alleges wrongdoing of UT employees, in conjunction with others, for which the directors should forfeit all monies they received from UT and pay the damages sustained by UT. All of the relief sought would not impose responsibility on the actual wrongdoers.

Derivative actions, an extremely useful check on directors' faithful performance of their duties, are justified in the face of directors' inaction, whether a failure to act diligently or an unjustified refusal to act. Action by the directors may be prompted by a demand, thereby vitiating the need for a lawsuit. Refusal to act can then be overcome, in protection of the corporation and its shareholders, by the derivative lawsuit. Nonetheless, the board should have the initial opportunity to make the decision. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990). Excusing a demand would not provide the directors an opportunity to seek to impose responsibility on the actual wrongdoers. Faced with a demand, no ac-

tion may be taken, but the directors should not be denied the opportunity. *See Shields v. Erickson,* 710 F.Supp. 686 (N.D.Ill.1989).

As a reasonable factual basis for excusing the failure to make demand on the directors has not been pleaded, the derivative action is dismissed. Accordingly, it is not necessary to reach the merits of the several derivative counts raised by defendants' motion to dismiss.

## II. *Class Action Claim—Violation of Section 14(a)*

■ Plaintiffs claim defendants violated Section 14(a) and Rule 14a–9 when they issued proxy statements containing materially misleading information. Section 14(a) of the Exchange Act governs disclosure requirements for proxy statements. Rule 14a–9 provides that proxy statements shall not contain any false or misleading statements with respect to any material fact.

Defendants argue plaintiffs' Section 14(a) claim must be dismissed because the existence of the "Operation Ill Wind" investigation was revealed in each of UT's annual reports which were referenced in the proxy statements alleged to be false and misleading.[4] The 1988 Annual Report stated that "the Corporation continues to be the subject of on-going criminal investigations in connection with its activities as a government contractor, including ... 'Operation Ill Wind.'" It was further stated that, if the corporation were charged as a result of these investigations, the corporation could be suspended as a government contractor and contracts found to be tainted with fraud could be voided. The 1989 Annual Report disclosed that "the Corporation was one of a number of defense contractors that had premises searched at several of its units and received grand jury subpoenas" and that, "in December 1989, two of Norden's former employees pleaded guilty to violations of federal law." The 1990 Annual Report disclosed that "three of Norden's former employees" had now "pleaded guilty to violations of federal

---

**4.** Defendants' motion is more properly one for summary judgment.

law." The Second Quarter 1991 Report disclosed the Paisley guilty plea.

Plaintiffs respond that defendants' argument misreads their claim. Plaintiffs argue that they have "identified specific facts which should have been disclosed in the proxy statements, referencing Section C of their memorandum." *See* Plaintiff's Memorandum at 61. Section C references ¶¶ 6, 57, 62 and 58 of the complaint. Those paragraphs, however, contain nothing more than conclusory statements that defendants engaged in bribery, conspiracy, etc., in violation of the law.

Plaintiffs' argument that defendants should have stated in their annual reports and, in turn, in their proxy statements, that they, the board of directors, were taking bribes and engaged in conspiracies is absurd, as those are merely allegations. It would be unreasonable to require board members to tell the world they are thieves, unless, of course, they have been charged and/or convicted. The factual disclosures noted were sufficient to put the investing public on notice that the company might be involved in dealings which could, quite possibly, affect the price of the company's stock. Thus, as plaintiffs have not shown the proxy statements to be misleading, the Section 14(a) and Rule 14a–9 claims are dismissed.

█ As no federal claims remain, this court declines to exercise pendent jurisdiction over plaintiffs' state law claims which can be brought in state court. *See Miller v. Lovett,* 879 F.2d 1066 (2d Cir.1989).

*Conclusion*

Defendants' motions to dismiss (document # 22 in 2:91cv00591 and document # 20 in 2:91cv00689) are granted.

SO ORDERED.