In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1828

IN RE: BIGLARI HOLDINGS, INC. SHAREHOLDER DERIVATIVE
LITIGATION.

CHAD R. TAYLOR and EDWARD DONAHUE,

*Plaintiffs-Appellants*,

*v.*

SARDAR BIGLARI, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00891-SEB-MJD — **Sarah Evans Barker**, *Judge*.

ARGUED DECEMBER 4, 2015 — DECIDED FEBRUARY 17, 2016

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. This is a shareholder derivative
suit against the directors of an Indiana company, Biglari
Holdings, Inc., that owns two restaurant chains, Western
Sizzlin' and Steak 'n Shake, both of which operate some res-
taurants, and franchise others, in many U.S. states. Sardar

Biglari is the CEO of Biglari Holdings and also the chairman of the company's board of directors. There are five other directors. Biglari Holdings used to own an investment company named Biglari Capital Corporation, which is the controlling partner in a pair of private investment entities called The Lion Fund and The Lion Fund II. Biglari Holdings had bought Biglari Capital Corporation from Sardar Biglari in 2010, but sold it back to him in 2013.

The basis of this suit is a claim by two shareholders of Biglari Holdings that in 2013 the board had approved three transactions (one of them the sale of Biglari Capital Corporation) that the plaintiffs call "entrenchment transactions," intended they say to cement Biglari's control of the company and enrich him at the expense of the other shareholders. One of the challenged transactions, a stock offering, was approved by the entire board and the other two were approved by the Governance, Compensation and Nominating Committee, consisting of four members of the board. The plaintiffs regard the board's members as Biglari's puppets.

Normally the first step in a shareholder derivative action is a demand that the board either correct the improprieties alleged or initiate an action on behalf of the corporation against members of the board. The plaintiffs did not make such a demand but instead alleged "demand futility," meaning that it was a forgone conclusion that the board would not respond to a demand by them. The suit is a diversity suit and the governing substantive law, the parties agree, is that of Indiana, under whose law demand futility can be shown by facts that create a reasonable doubt that a majority of the directors are disinterested (maybe they stood to gain a benefit from board approval of the transactions that would not be

shared with the company's shareholders), or that the board was independent, or that it had exercised responsible business judgment. See *Piven v. ITT Corp.*, 932 N.E.2d 664, 668 (Ind. 2010); *Carter ex rel. CNO Financial Group, Inc. v. Hilliard*, 970 N.E.2d 735, 748–49 (Ind. App. 2012).

Indiana courts, although they seek guidance in such cases from Delaware, have a higher threshold for proof of demand futility. Demand is futile if a derivative claim poses a significant risk of personal liability for the directors, *Piven v. ITT Corp.*, *supra*, 932 N.E.2d at 670, but "a director is not liable for any action taken as a director … unless … the breach or failure to perform constitutes willful misconduct or recklessness." Ind. Code § 23-1-35-1(e)(2); see also *Brane v. Roth*, 590 N.E.2d 587, 590 (Ind. App. 1992). The official comment to another Indiana statutory provision, Ind. Code § 23-1-32-4, states that "the decision whether and to what extent to investigate and prosecute corporate claims … should in most instances be subject to the judgment and control of the board."

Thus "Indiana has statutorily implemented a strongly pro-management version of the business judgment rule," *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001)—the rule that creates "a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest." *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), overruled on other grounds in *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

The district judge ruled that the plaintiffs had failed to demonstrate demand futility as defined in Indiana law, and so dismissed their suit, precipitating this appeal.

Although we'll see that of the six directors of Biglari
Holdings only Mr. Biglari stands to obtain a direct financial
benefit from the challenged transactions, the plaintiffs claim
that the transactions will "entrench" all six—that is, make it
impossible as a practical matter for them ever (or at least for
a very long time) to be removed from the board, even if the
company would benefit from such turnover. But as the dis-
trict judge pointed out, the plaintiffs have not alleged that
any of the directors were in peril of being removed from the
board and, if they were not, it is unlikely that their motiva-
tion for approving the challenged transactions was en-
trenchment. See *Grobow v. Perot*, *supra*, 539 A.2d at 188.

The plaintiffs argue that some of the directors are be-
holden to Biglari and thus not independent. One is conceded
to have close personal ties to him, dating from the time
when he was Biglari's professor at Trinity University in Tex-
as. This may raise a question about that director's independ-
ence, but that leaves four other directors (besides Biglari).
They are a solid majority of the six-member board and the
entire membership of the Governance, Compensation and
Nominating Committee. One of the four had served on the
board of a company that Biglari tried unsuccessfully to take
over—but that doesn't suggest he's in Biglari's pocket! An-
other, Ruth J. Person, resigned in 2014 as chancellor of the
University of Michigan-Flint, a branch of the University of
Michigan, and the plaintiffs argue that she's now financially
dependent on her salary as a member of the board of Biglari
Holdings and so will kowtow to Biglari. That's unlikely.
That a director is paid for his or her services does not estab-
lish the kind of financial interest that would excuse demand.
*Grobow v. Perot*, *supra*, 539 A.2d at 188. Nor is Person finan-
cially dependent on her income as a member of Biglari Hold-

ings' board. She did not retire from the university, but merely returned to her professorship (she is a professor of management) at the university. Her website recites an extensive list of distinguished positions that she has held. "Ruth Person, Ph.D., Professor of Management," www.umflint.edu/som/ruth-person (visited Feb. 16, 2016).

Kenneth Cooper, another member of the board, has more entanglements with Biglari. He is the founder of Ascot Management, LLC, and Biglari is on the board of that company. Cooper is also an investor in The Lion Fund(s). Biglari Holdings is the largest investor in those funds, however, and so the shareholders of Biglari Holdings are indirect investors in them—thus aligning Cooper's interest with their own. As for his personal relationship with Biglari, "allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Finally, board member James Mastrian is also on the board of a company that Biglari Holdings owns a 12.8 percent share of, a fact omitted from a required filing with the Securities and Exchange Commission. But the plaintiffs have not explained how the connection between the two companies, or the filing omission, makes Mastrian a puppet of Biglari. And the fact that Biglari and Mastrian "developed business relationships before joining the board … [is] insufficient, without more, to rebut the presumption of independence." *Id*. at 1051.

This leaves the plaintiffs to argue that the board of directors approved three transactions that were so obviously im-

proper from the standpoint of benefiting the shareholders as a whole that the board cannot be thought to have been acting in their interest.

One involves a licensing agreement approved by the board's Governance, Compensation and Nominating Committee in 2013 that allows the company to use Biglari's name and likeness in its advertising without payment so long as he remains as CEO, but requires it to pay him 2.5 percent of the company's gross revenues from products and services that bear Biglari's name as royalties for the use of his name and likeness for five years if he's removed as CEO, resigns because of an involuntary termination event, or loses his sole authority over capital allocation, or a majority of the board is replaced, or someone other than Biglari or the company's existing shareholders obtains more than 50 percent of the shares and therefore acquires control of the company.

The plaintiffs argue that these provisions are designed to entrench the board and Biglari by making a change of control unlikely because a replacement of a majority of the board or of Biglari himself would trigger costly royalty obligations. They point out that 2.5 percent of the company's gross revenues in 2012 (for example) would have been about $17.5 million even though the company's net earnings were only $21.6 million—and so 81 percent of those earnings would have gone to Biglari in the hypothetical event that one of the triggering events had occurred that year, even if he no longer had any involvement in the company.

But the 81 percent figure is misleading. The $21.6 million in net earnings is an accounting figure affected by the amount the company decides to realize as earnings in a given year. At the oral argument the defendants' lawyer told us

that the actual value of Biglari Holdings' assets, which include appreciation in the value of investments (for remember that Biglari Holdings has invested millions of dollars in the two investment funds), is much greater. The company does not realize all of its investment gains every year, and gains not yet realized are not reported as income on the company's income statement. Thus the net earnings figure does not reveal the true financial health of the company, and so the required royalty need not have the grave impact that the plaintiffs allege. And although at the end of fiscal year 2014 the value of Biglari Holdings' investments totaled $766 million, a further increase in their value will not affect the royalty obligation. For if a triggering event occurs, the company will be required to pay 2.5 percent of its gross revenues only from products and services that bear Biglari's name or likeness.

The defendants point out, moreover, that the company is compensated (whether fully or not we don't know) for the cost to it of a triggering event by the fact that unless and until it occurs the company remains free to use Biglari's name in licensing and advertising at no cost—which according to a report prepared by outside counsel for the company's directors before they entered into the agreement is unusual, because it amounts to giving the company a free trademark license. The plaintiffs' riposte that Biglari's name isn't worth much, for he is hardly a well-known celebrity. Yet he is recognized to be an up-and-coming entrepreneur (he is still in his thirties). And as the defendants' lawyer explained at oral argument without contradiction, Biglari has already achieved celebrity status in the Middle East, having fled Iran (his birthplace) under dramatic circumstances and achieved swift success as an American businessman. And so his name

might be a selling point as Steak 'n Shake expands by opening franchises in Middle Eastern countries (perhaps not excluding Iran).

The next transaction challenged by the plaintiffs is the sale of Biglari Capital Corporation (BCC) by Biglari Holdings to Mr. Biglari in 2013 for $1.7 million. Biglari Holdings had bought BCC from him three years earlier for $4.2 million, and the plaintiffs argue that by selling it back to him at such a low price the board radically disserved the interests of the shareholders.

The Governance, Compensation and Nominating Committee of the board of directors had engaged a valuation firm to value Biglari Holdings' interest in BCC, and the firm estimated the value as being between $8.8 and $10.2 million. The Committee gave two reasons for nonetheless selling BCC for a mere $1.7 million. First, prior to the sale but after the valuation, BCC had distributed $5.7 million worth of assets to Biglari Holdings, leaving BCC with assets worth only $3.1 to $4.5 million. The Committee concluded that a further reduction in the sale price was warranted because the valuation "did not reflect any obligation that BH has to pay an incentive bonus" to Biglari for increases in Biglari Holdings' book value attributable to BCC. The Committee estimated the cost of this bonus obligation at $1.9 million. The Committee had "retained separate counsel, tax/accounting advisors, an independent compensation consultant, and a financial advisor to assist the Committee in the structuring, evaluation, and negotiation of [the] transaction," and after consultation with these experts had unanimously approved the $1.7 million sale figure. The defendants state without contradiction that Biglari Holdings benefited from the sale of

BCC by a reduction in regulatory burdens related to invest‐
ments and by avoiding potential conflicts of interest by
clearly separating Biglari Holdings from The Lion Fund.

The plaintiffs' final challenge is to the board's failure
(they allege) to deliberate adequately and to retain a finan‐
cial advisor before completing a stock offering that raised
$75 million. But surely the company wanted to raise as much
money as possible, and if a financial advisor would have in‐
creased the take from the offering by more than his fee why
would the company not have hired one? The plaintiffs argue
that Biglari was seeking to entrench himself and that the
board failed to consider the entrenching effects of the rights
offering. They point out that the offering allowed Biglari to
buy more shares than other offerees. The way this worked,
according to the plaintiffs, is that Biglari Holdings issued
shares of common stock but discounted them by between 30
and 40 percent relative to the share prices of stock in Biglari
Holdings. The offering contained an oversubscription fea‐
ture, so if the offering was not fully subscribed by the exist‐
ing shareholders other shareholders who had exercised their
rights could acquire the shares not taken. Biglari did just that
and purchased additional voting shares, thus increasing his
stake in the company, while shareholders who did not exer‐
cise their option to purchase new shares saw their share val‐
ues diluted. Biglari had the same right to purchase shares as
any other shareholder. And when the smoke cleared his
share of ownership of the stock of Biglari Holdings had risen
only from 15.4 to 16.1 percent.

Given the stringency of the Indiana standard of demand
futility and the lack of strong support for the plaintiffs'
claims to demonstrate that futility, the three challenged

transactions, whether examined individually or together, cannot be deemed so oppressive to shareholders as to create a substantial doubt that the transactions were the product of a valid exercise of business judgment by an unbiased and independent board. Demand futility has not been shown. The judgment of the district court is therefore

AFFIRMED.