## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WILLIAM HUGHES, JR., Derivatively )
on Behalf of Nominal Defendant KANDI )
TECHNOLOGIES GROUP, INC., )
                 )
         Plaintiff, )
                 )
         v. )    C.A. No. 2019-0112-JTL
                 )
XIAOMING HU, XIAOYING ZHU, )
CHENG WANG, BING MEI, JERRY )
LEWIN, HENRY YU, LIMING CHEN, )
                 )
         Defendants, )
                 )
         and )
                 )
KANDI TECHNOLOGIES GROUP, )
INC., )
                 )
         Nominal Defendant. )

## MEMORANDUM OPINION

Date Submitted: February 6, 2020
Date Decided: April 27, 2020

Michael Van Gorder, FARUQI & FARUQI LLP, Wilmington, Delaware; Demet Basar, Veronica Bosco, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP, New York, New York; Daniel B. Rehns, Kathryn A. Hettler, HACH ROSE SCHIRRIPA CHEVERIE LLP, New York, New York; *Counsel for Plaintiff.*

Stamatios Stamoulis, STAMOULIS & WEINBLATT, LLC, Wilmington, Delaware; Richard J.L. Lomuscio, RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP, New York, New York; *Counsel for Defendants Xioaming Hu, Xiaoying Zhu, Cheng Wang, Bing Mei, Jerry Lewin, Henry Yu, and Liming Chen.*

**LASTER, V.C.**

Kandi Technologies Group, Inc. (the "Company") is a publicly traded Delaware corporation based in China. The Company has struggled persistently with its financial reporting and internal controls, encountering particular difficulties with related-party transactions. The complaint describes problems dating back to 2010. In March 2014, the Company publicly announced the existence of material weaknesses in its financial reporting and oversight system, including a lack of oversight by the Audit Committee and a lack of internal controls for related-party transactions. The Company pledged to remediate these problems. Instead, in March 2017, the Company disclosed that its preceding three years of financial statements needed to be restated. In connection with the restatement, the Company disclosed that it lacked:

- Sufficient expertise relating to technical knowledge of US GAAP requirements and SEC disclosure regulations;

- Sufficient expertise to ensure the completeness of the disclosure of financial statements for equity investments;

- Sufficient expertise to ensure the proper disclosure of related-party transactions;

- Effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to accounts receivable, accounts payable, and notes payable; and

- Sufficient expertise to ensure the accuracy of the accounting and reporting of income taxes and related disclosures.

Despite having pledged three years earlier to get its house in order, the Company had none of these necessary competencies.

The plaintiff is a stockholder in the Company. The plaintiff filed this suit on the Company's behalf to recover damages from (i) the three directors who comprised the Audit

1

Committee during the Company's period of persistent problems, (ii) the Company's CEO, and (iii) the three CFOs who served in quick succession during the years leading up to the March 2017 restatement. The plaintiff contends that the director defendants consciously failed to establish a board-level system of oversight for the Company's financial statements and related-party transactions, choosing instead to rely blindly on management while devoting patently inadequate time to the necessary tasks. The plaintiff contends that the director defendants' failures led to the March 2017 restatement, which caused the Company harm. The plaintiff also contends that because the Company's performance was inflated during the pre-restatement period, the officer defendants received excessive compensation and were unjustly enriched.

The defendants have moved to dismiss the complaint pursuant to Rule 23.1, contending that the plaintiff failed to make a demand on the board or plead that demand would have been futile. The plaintiff obtained books and records before filing suit. The fruits of that investigation—and, just as important, what the Company conspicuously failed to produce—have enabled the plaintiff to plead a complaint that supports a reasonable pleading-stage inference of a bad faith failure of oversight by the named director defendants. Four of the defendants comprise a majority of the board that would have considered a demand, and the substantial threat of liability renders them incapable of disinterestedly considering a demand. Demand would have been futile, so the Rule 23.1 motion is denied.

The defendants also have moved to dismiss the complaint pursuant to Rule 12(b)(6), contending that the plaintiff failed to state a claim on which relief can be granted. Both

2

sides treated the analysis of the Rule 23.1 motion as dispositive of the Rule 12(b)(6) motion. That motion is also denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences, including inferences drawn from the documents.

The inferences that the plaintiff receives in this case are informed by the plaintiff's use of Section 220 of the Delaware General Corporation Law to obtain books and records. In response to the plaintiff's requests, the Company produced some documents and stipulated that "any remaining materials requested by Plaintiff either do not exist or had been withheld on privilege grounds." *Hughes v. Kandi Techs. Gp., Inc.*, C.A. No. 2017-0700-JTL, Dkt. 24, Stipulation of Dismissal With Prejudice, at 2. Given this stipulation, if the Company failed to produce a document that it would reasonably be expected to possess if a particular event had occurred, then the plaintiff is entitled to a reasonable inference that the event did not occur. *See Morrison v. Berry*, 191 A.3d 268, 275 n.20 (Del. 2018).

For example, the plaintiff asked the Company to produce minutes from board meetings that took place between December 31, 2009, and May 10, 2017, at which specific topics were discussed. *See* Compl. Ex. L, at 7. In response, the Company did not produce any minutes evidencing any meetings addressing those topics until a meeting of the Audit Committee on May 9, 2014. The plaintiff is entitled to the reasonable inference that no earlier meetings took place at which those topics were addressed.

3

## A. The Company, The Joint Venture, And The Service Company

The Company is a Delaware corporation based in Jinhua, China. The Company accessed the United States capital markets in 2007 through a reverse merger with a defunct but still publicly listed Delaware entity.

In March 2013, the Company entered into a joint venture with Geely Automobile Holdings Ltd. (the "Joint Venture"). The complaint does not contain any allegations about Geely, which is therefore inferred to be an unaffiliated third party. The Company sells parts to the Joint Venture, which uses the parts to manufacture electric vehicles. The Company and Geely each own 50% of the Joint Venture.

The Joint Venture sells the finished electric vehicles to Zhejiang ZuoZhongYou Electric Vehicle Service Co., Ltd. (the "Service Company"), which sells and leases the vehicles. The Company owns 9.5% of the Service Company.

Xiaoming Hu is the Company's CEO and chairman of its board of directors. He beneficially owns 28.4% of the Company. He also owns 13% of the Service Company.

The complaint alleges that the Joint Venture and Service Company were structured to enable the Company to take advantage of subsidies that the Chinese government made available to producers and purchasers of electric vehicles. Through its ownership in the Joint Venture, the Company benefited from the subsidies provided to producers. Through its ownership in the Service Company, the Company benefited from the subsidies provided to purchasers. The complaint implies that by structuring its operations in this way, the Company engaged in double-dipping that was contrary to how the Chinese government intended the subsidies to function, but the complaint does not seek relief on the theory that

4

the double-dipping strategy was illegal. The complaint instead focuses on the Company's internal controls and accounting processes.

**B.      The 2010 Audit**

In March 2011, AWC (CPA) Limited audited the Company's financial statements for the year ending December 31, 2010 (the "2010 Audit"). Although purportedly acting as an independent, outside auditor, AWC had no clients other than the Company.

During the 2010 Audit, AWC identified "key audit risks" and "a key control weakness" involving the Company's treatment of related-party transactions. Compl. Ex. A ¶ 28. AWC determined that when recording transactions with Kandi USA, one of the Company's five largest customers, the Company had used a different name for Kandi USA. When AWC asked the Company whether the counterparty was a related party, the Company dodged the question, and AWC did not follow up. Kandi USA was a related party; it was owned by Wangyuan Hu, the son of CEO Hu.

In March 2011, five days before the Company filed its Annual Report on Form 10-K for the year ending December 31, 2010, CEO Hu suggested that AWC resolve the issue raised by the Company's sales to Kandi USA by booking them to a different customer's account. Despite evidence that Kandi USA actually purchased the goods, AWC complied. AWC also eliminated any references to Kandi USA from its audit trail.

During the 2010 Audit, AWC also found that the Company had parked large amounts of cash in the personal bank accounts of its officers and employees. AWC discovered that one unidentified employee was holding $3 million of the Company's reported year-end cash balance in a personal account. AWC did not take steps determine

5

why this was so. Nor did AWC verify that the cash actually existed. AWC also did not explore whether the parking of this cash constituted a related-party transaction that needed to be disclosed in the Company's financial statements. AWC merely reported the transaction to the Audit Committee as "evidence of a key internal control weakness." Compl. Ex. A ¶ 24.

AWC later discovered that the same unidentified individual was holding an additional $2.5 million of the Company's reported year-end cash balance in a different bank account. AWC again did not take steps determine why this was so. AWC also did not explore whether the parking of this cash constituted a related-party transaction that needed to be disclosed in the Company's financial statements. Unlike with the $3 million in parked cash, AWC did not report this additional $2.5 million to the Audit Committee.

Most strikingly, AWC discovered that CEO Hu held another $1.6 million of the Company's reported year-end cash balance in a personal account. AWC did not take steps determine why this was so. Nor did AWC explore whether this was a related-party transaction that needed to be disclosed in the Company's financial statements. As with the additional $2.5 million of parked cash held by the unidentified employee, AWC did not report CEO Hu's holding of cash to the Audit Committee.

## C. The 2011 Audit

In March 2012, AWC audited the Company's financial statements for the year ending December 31, 2011 (the "2011 Audit"). AWC identified "the collectability of notes receivable as a key audit risk." Compl. Ex. A ¶ 38. During the audit, AWC discovered that a single note constituted $33.1 million of the Company's $37.9 million notes receivable

6

balance. The borrower had not made any interest payments on the note in 2011. Despite these warning signs, AWC did not evaluate the creditworthiness of the borrower or raise concerns about the collectability of the note.

## D.     The 2012 Audit

In March 2013, AWC audited the Company's financial statements for the year ending December 31, 2012 (the "2012 Audit"). As with the 2010 Audit, AWC identified related-party transactions as a key risk. During the audit, AWC discovered transactions between the Company and Kandi USA. As in 2010, the related-party transactions did not identify Kandi USA by name. This time, the entries referred to Kandi USA as Eliteway Management ("Eliteway"), which was later revealed to be a trade name for Kandi USA. The transactions were material, but AWC did not scrutinize them, nor did AWC identify them as related-party transactions requiring disclosure.

## E.     The 2013 10-K

On March 17, 2014, the Company filed its Annual Report on Form 10-K for the year ending December 31, 2013 (the "2013 10-K"). The Company disclosed that its "disclosure controls and procedures were not effective as of December 31, 2013, due to a material weakness." Compl. ¶ 112.

The 2013 10-K identified multiple factors that contributed to this ostensibly singular weakness. First, the head of the Company's internal audit department reported to CEO Hu rather than to the Audit Committee, which "impaired the independence and objectivity of the internal control audit department." *Id.* Second, there was a lack of communication between the Company's internal audit department and the Audit Committee. Third, the

Company did not evaluate the effectiveness of the Audit Committee on a yearly basis. The 2013 10-K also disclosed that the Company did not have adequate internal controls for related-party transactions.

The 2013 10-K described the Company's efforts to remediate its deficiencies. First, the Company had changed its reporting structure so that the head of the internal audit department reported to the Audit Committee. Second, the Company committed to revising its Audit Committee's charter to ensure that "regular and frequent reporting on the internal audit related matters to the Audit Committee is carried out by the head of internal audit department." *Id.* ¶ 115. Third, the Company resolved to evaluate the effectiveness of the Audit Committee on a yearly basis. The Company also pledged that all of its related-party transactions would be subject to review by the Audit Committee.

F.      **The Audit Committee's Actions In 2014**

On May 9, 2014, two months after the filing of the 2013 10-K, the Audit Committee met. The members of the Audit Committee at the time were Henry Yu, Liming Chen, and Jerry Lewin. Yu had been a member of the Audit Committee since July 2011 and served as Chair of the committee throughout that time. Chen had been a member of the Audit Committee since May 2012. Lewin had been a member of the Audit Committee since November 2010. The Company's Chief Financial Officer at the time, Xiaoying Zhu, also attended the meeting. So did two representatives of AWC: Albert Wong and Martin Wong.

The Audit Committee spent forty-five minutes discussing "matters relating to relationship transaction[s]." Compl. Ex. G, at 1. During the meeting, the committee members reviewed a document titled "sales contract entered into with Eliteway." *Id.* at 2.

Yu stated that he would deliver agreements related to this "relationship transaction" to the Audit Committee after the meeting. The Company did not produce any related-party agreements in response to the plaintiff's inspection demand. It is reasonable to infer that the Audit Committee did not receive or review the agreements.

The Audit Committee also purportedly reviewed a document titled "Approval Procedures of Relationship Transaction." *Id.* The Company failed to produce this document in response to the plaintiff's inspection demand. It is reasonable to infer that the Audit Committee did not receive or review this document.

On May 30, 2014, three weeks later, the Audit Committee met again. Lewin, Yu, and Chen attended as members of the committee. So did Chenming Sun, the head of the Company's internal audit department.

This time, the meeting lasted for forty minutes. The Audit Committee purportedly reviewed and approved a new "Internal Audit Activity Charter" and a new "Management Policy on Related-Party Transactions." Compl. ¶ 118; Compl. Ex. H. The Company did not produce either of these documents in response to the plaintiff's inspection demand. For the "Management Policy on Related-party Transactions," the absence of the document from the production supports an inference that it did not exist. The same inference could be drawn for the Audit Committee Charter, but it was publicly available at the time the complaint was filed.

The Audit Committee Charter specified that the Audit Committee's responsibilities included the following:

9

- Reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies;

- Reviewing the Company's system of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the Company;

- Reviewing the Company's accounting and financial reporting processes and the audits of the financial statements of the Company;

- Reviewing and appraising with management the performance of the Company's independent auditors;

- Providing an open avenue of communication between the independent auditors, financial and senior management, the internal audit function, and the board of directors; and

- Overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.

Compl. ¶ 196.

In July 2014, Yu met with management, the Company's internal audit team, and AWC to "review the progress of implementation of the remediation measures and spearhead[] a comprehensive remediation plan to fully address the deficiencies in [the Company's] internal controls." *Id.* ¶ 118. After continuing its remedial efforts, the Company determined that its internal controls were effective as of September 30, 2014. *Compare id.* ¶ 116 (quoting the Company's May 2014 disclosure that its "disclosure controls and procedures were not effective"), *and id.* ¶ 118 (quoting the Company's August 2014 disclosure that its "disclosure controls and procedures were not effective"), *with id.* ¶ 120 (quoting the Company's November 2014 disclosure that its "disclosures and controls were effective [as of September 30, 2014]").

## G.  The Audit Committee's Actions In 2015

After the Audit Committee's meetings in May 2014, the committee did not meet again until March 13, 2015. The catalyst for the March 2015 meeting appears to have been the need to review, discuss, and approve the Company's Annual Report on Form 10-K for the year ending December 31, 2014 (the "2014 10-K"). The Audit Committee members were still Yu, Chen, and Lewin. CFO Zhu also attended the meeting, as did Sun, the head of the internal controls department. Martin Wong attended for AWC.

The meeting lasted fifty minutes. CFO Zhu summarized the Company's year-end financial results, and this discussion appears to have taken up most of the meeting. *See* Compl. Ex. I. At the end of the meeting, the Audit Committee approved a "Policy of Related-party Transaction Relating to JV Shareholder." *Id.* at 4. Management had prepared the policy, which authorized management to "conduct business activities with [the] JV." *Id.* It is reasonable to infer at the pleading stage that the policy did not place meaningful restrictions on management. It is also reasonable to infer that with the Audit Committee having not met for almost a year, there was no possible way that the Audit Committee could have fulfilled all of the responsibilities it was given under the Audit Committee Charter during a fifty-minute meeting.

On March 15, 2015, the Company filed the 2014 10-K. The Company described its disclosure controls and procedures as "effective." Compl. ¶ 124.

Three weeks later, on April 7, 2015, the Company's board of directors acted by unanimous written consent to adopt a series of resolutions. One resolution determined that Yu, Chen, and Lewin, plus then-director Ni Guangzheng, qualified as independent

11

directors under the NASDAQ listing standards. Another resolution determined that Yu and Lewin qualified as Audit Committee Financial Experts. Yet another resolution determined that it was in the best interests of the Company to maintain AWC as the Company's independent auditor for the fiscal year ending December 31, 2015. These were determinations that should have been made before the filing of the 2014 10-K. The Audit Committee's failure to address these issues during its March 2015 meeting reinforces the inference that there was no possible way that the Audit Committee could have fulfilled all of the responsibilities it was given under the Audit Committee Charter by meeting for just fifty minutes after not meeting during the preceding ten months.

Two weeks after the execution of this written consent, CFO Zhu resigned from her position as CFO, effective April 30, 2015. Cheng Wang took over as the Company's Chief Financial Officer.

## H.     The Audit Committee's Actions In 2016

The Audit Committee did not meet again until March 7, 2016, approximately one year later. The catalyst again appears to have been the need to approve the Company's Annual Report on Form 10-K for the year ending December 31, 2015 (the "2015 10-K"). The members of the Audit Committee were still Yu, Chen, and Lewin. CFO Wang also attended the meeting, as did Sun, the head of the internal audit department. Lai Wingwai attended as a representative of AWC.

The meeting lasted for thirty minutes. CFO Wang summarized the Company's year-end financial results. CFO Wang then described related-party transactions that took place in 2015. Management identified two related parties: Kandi USA and the Service Company.

Management represented that the Company had not engaged in any related-party transactions with Kandi USA during 2015. Management reported that the Company had engaged in related-party transactions with the Service Company, describing the transactions as mainly involving "battery sales." Compl. Exs. C, J, at 2. It is reasonable to infer that with the Audit Committee having not met for a year, there was no possible way that the Audit Committee could have fulfilled all of the responsibilities it was given under the Audit Committee Charter during a thirty-minute meeting.

On March 14, 2016, filed the 2015 10-K. The Company described its disclosure controls and procedures as "effective." Compl. ¶ 143.

As it had one year previously, the Audit Committee acted just weeks later to address issues that should have been addressed before the filing of the 2015 10-K. On March 22, 2016, the Audit Committee acted by unanimous written consent to ratify a very different description of the related-party transactions between the Company and the Service Company. In the consent, the Audit Committee signed off on related-party transactions with the Service Company totaling $42,032,060. Management represented that the consideration for the transactions was "based on fair market price." Compl. Ex. K, at 1. In the same written consent, the Audit Committee authorized management to engage in related-party transactions with the Service Company during the remainder of 2016. The Audit Committee's failure to address these issues during its March 2016 meeting reinforces the inference that there was no possible way that the Audit Committee could have fulfilled all of the responsibilities it was given under the Audit Committee Charter by meeting for just thirty minutes after not meeting for a year.

13

**I. The Company Replaces AWC.**

During a meeting on April 12, 2016, the Company's board of directors resolved to terminate AWC as the Company's auditor, effective immediately. The seven members of the board at the time were the three members of the Audit Committee—Yu, Chen, and Lewin—plus CEO Hu, CFO Wang, Guangzheng, and Qian Jiansong. According to the minutes, the board retained BDO China Shu Lun Pan CPAs as the Company's new auditor, effective immediately.

A separate document indicates that the Audit Committee acted by unanimous written consent that same day to replace AWC with BDO China. The Audit Committee consent attributed the change to a determination by "management of the Company" that it was "in the best interest of the Company to change its independent auditors." Compl. Ex. B, at 1.

On May 18, 2016, one month after the Company parted ways with AWC, the Public Company Accounting Oversight Board issued an order instituting disciplinary proceedings against AWC, making findings about AWC's conduct, and imposing sanctions on the firm (the "PCAOB Order"). Compl. Ex. A. The sanctions addressed AWC's handling of the 2010, 2011, and 2012 Audits and imposed monetary penalties on AWC and its principals.

After the issuance of the PCAOB Order, NASDAQ asked the Company to verify its cash balances. CFO Wang arranged for an audit of the Company's cash balances, and BDO China began the audit on July 11, 2016. Lewin later asked if the audit generated any adverse findings. BDO China reported none.

14

**J.      The August 2016 Audit Committee Meeting**

On August 1, 2016, the Audit Committee convened to review the Company's Quarterly Report on Form 10-Q for the quarter ending June 30, 2016. The members of the Audit Committee continued to be Yu, Chen, and Lewin. CFO Wang also attended, as did Sun, the head of the internal audit department. Liu Yi and Mou Xun attended as representatives of BDO China.

The meeting lasted for one hour. CFO Wang summarized the Company's quarterly financial results. The Audit Committee discussed the results of BDO China's audit of the Company's cash balances. CFO Wang then reported on the Company's related-party transactions for the six months ending June 30, 2016. According to CFO Wang, sales to the Service Company totaled nearly $4 million, while receivables from the Service Company totaled nearly $11 million. Management did not identify any other related-party transactions.

During the meeting, the Audit Committee also discussed a decision by the Chinese government to delay its subsidy payments to the Joint Venture, which affected the Company's outlook for the remainder of the year. Lewin suggested that the Company should consider alternatives to mitigate its reliance on the subsidies that the Chinese government was providing to producers and purchasers of electric vehicles.

In September 2016, the Chinese government decided to phase out the subsidies. This decision followed a months-long investigation into the Company and other Chinese manufacturers who appeared to have structured their operations to take advantage of subsidies as both producers and purchasers of vehicles.

15

**K.** **The November 2016 Disclosures**

On November 2, 2016, the Company disclosed for the first time that it had engaged in material transactions in 2012 with Kandi USA using its trade name, Eliteway. The Company also disclosed that it had engaged in material transactions in 2013 and 2014 with Kandi USA, again using the trade name Eliteway. The total amount of the transactions was identified as $9,888,751. The Company claimed that all of the transactions had been at arm's length.

The Company also disclosed additional related-party transactions with the Service Company, resulting in additional receivables due from the Service Company. As of December 31, 2014, the receivables totaled over $40 million. As of December 31, 2016, the receivables totaled $10.4 million.

The Company's failure to disclose these transactions earlier reinforces the inference that the Audit Committee was not carrying out the duties it was given under the Audit Committee Charter. On November 14, 2016, two weeks after these disclosures, CFO Wang resigned from the position of Chief Financial Officer and became the Company's Chief Strategy Officer. Bing Mei took over as the Company's Chief Financial Officer.

**L.** **The March 2017 Announcement**

On March 16, 2017, the Company announced that its financial statements from 2014 through the third quarter of 2016 could not be relied upon and needed to be restated (the "March 2017 Announcement"). As part of the restatement, the Company committed to provide separate audited financial statements for the Company's equity investment in the Joint Venture. The restated financials would include:

- Corrections to the classification of notes receivable and notes payable in the Company's statements of cash flow;

- Revisions in the Company's financial statement presentation to separately identify certain related-party accounts;

- Amendments to financial statement footnotes discussing the Company's tax situation;

- Adjustments of previously recorded "construction-in-progress;"

- Expansions of two tables of sales to and purchases from the Joint Venture; and

- The removal of "unaudited" labels from certain tables in footnotes discussing the Company's tax situation.

Compl. ¶ 163. In addition, the Company announced that it was "reassessing its internal controls over its financial reporting and compliance programs." *Id.*

Shortly after the March 2017 Announcement, the Company filed its Annual Report on Form 10-K for the year ending December 31, 2016 (the "2016 10-K"). The 2016 10-K disclosed that the Company lacked:

- Sufficient expertise relating to technical knowledge of US GAAP requirements and SEC disclosure regulations;

- Sufficient expertise to ensure the completeness of the disclosure of financial statements for equity investments;

- Sufficient expertise to ensure the proper disclosure of related-party transactions;

- Effective controls to ensure the proper classification and reporting of certain cash and non-cash activities related to accounts receivable, accounts payable, and notes payable; and

- Sufficient expertise to ensure the accuracy of the accounting and reporting of income taxes and related disclosures.

17

## M. The Federal Litigation

After the March 2017 Announcement, various stockholders filed four securities class actions and one derivative lawsuit in the United States District Court for the Southern District of New York. The federal court consolidated the securities actions.

On September 30, 2019, while this lawsuit was pending, the federal court granted the defendants' motion to dismiss the securities actions. In its decision, the court held that the plaintiffs had not pled facts with sufficient particularity to support a strong inference of scienter, as required by the federal securities laws and their implementing regulations. *See In re Kandi Techs. Gp., Inc. Sec. Litig.*, 2019 WL 4918649, at *3–6 (S.D.N.Y. Oct. 4, 2019). In reaching these conclusions, the district court noted that "the fact that [the Company's] restatements had no impact on [the Company's] corporate income severely undercuts an inference of fraud." *Id.* at *8.

## N. The Plaintiff's Investigation

On May 10, 2017, the plaintiff sought to inspect books and records of the Company pursuant to Section 220. *See* Compl. Ex. L. After the Company's board of directors declined to respond, the plaintiff filed an action in this court. For nearly a year, the plaintiff and the Company engaged in protracted negotiations. After guidance from this court, the Company produced documents responsive to the plaintiff's demand. The parties stipulated to the dismissal of the Section 220 Action on September 28, 2018.

On February 14, 2019, the plaintiff filed this plenary action. The lengthy complaint spans 116 pages and contains 306 numbered paragraphs. It names as defendants the

18

members of the Audit Committee (Yu, Chen, and Lewin), CEO Hu, and the Company's three successive CFOs (Zhu, Wang, and Mei).

In Count I, the complaint asserts that the defendants "individually and collectively, breached their fiduciary duties by willfully failing to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting." Compl. ¶ 293. The complaint alleges that as a result of the defendants' breaches of duty, the Company suffered harm. *Id.* ¶ 300.

In Count II, the complaint asserts a claim for unjust enrichment. The Complaint alleges that the defendants "either benefitted financially" from the conduct described in the Complaint or benefitted indirectly from "unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from [the Company] that was tied to the performance or artificially inflated valuation of [the Company], or received compensation that was unjust in light of Defendants' bad faith conduct." *Id.* ¶ 304.

## II.     LEGAL ANALYSIS

The defendants have moved to dismiss the complaint pursuant to Court of Chancery Rule 23.1 on the grounds that the plaintiff did not make demand on the board and failed to plead that demand would have been futile. The defendants have also moved to dismiss pursuant to Court of Chancery Rule 12(b)(6) on the grounds that the complaint failed to state a claim upon which relief can be granted. Both motions are denied.

19

## A.    Rule 23.1

When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).[1] "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). Section 141(a) vests statutory authority in the board of directors to determine what action the corporation will take with its litigation assets, just as with other corporate assets. *See id.*

---

[1] In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be de novo and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits the cumbersome subsequent history, because stating that they were overruled by *Brehm* creates the misimpression that *Brehm* rejected a series of foundational Delaware decisions.

In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim. *Aronson*, 473 A.2d at 811. Because directors are empowered to manage, or direct the management of, the business and affairs of the corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where (i) the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

The plaintiff in this case chose not to make demand. Consequently, for the plaintiff to be able to move forward on behalf of the Company, the complaint must "allege with particularity . . . the reasons . . . for not making the effort [to make a litigation demand]," Ct. Ch. R. 23.1, and this court must determine based on those allegations that "demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." *Stone v. Ritter*, 911 A.2d 362, 367 (Del. 2006). Stockholders choosing this route "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice pleadings." *Brehm*, 746 A.2d at 254. Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by the allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187. But once a plaintiff pleads particularized allegations, then the plaintiff is entitled to all "reasonable inferences [that] logically flow from particularized facts alleged by the plaintiff." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004). While Rule 23.1 requires

21

that a plaintiff allege specific facts, "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254.

At the time the complaint was filed, the Company's board comprised CEO Hu, Lewin, Yu, Chen, and non-parties Feng Zhu and Yi Lin (the "Demand Board"). The operative question for demand futility is whether the Demand Board had a majority of disinterested and independent directors who could properly consider a demand to bring litigation. Demand is futile if there is a reasonable basis to doubt whether at least three of the six directors could exercise independent judgment when deciding whether to bring the litigation.

### 1. Demand Futility Analysis

The Delaware Supreme Court has established two tests for determining whether the allegations of a complaint sufficiently plead demand futility. *Wood v. Baum,* 953 A.2d 136, 140 (Del. 2008) ("Two tests are available to determine whether demand is futile."). In *Aronson*, the seminal demand-futility decision, the Delaware Supreme Court considered a scenario where a plaintiff challenged a transaction that had been approved by the same directors who would consider a demand. The central legal question was therefore whether the complaint's allegations about the directors' involvement in the decision to approve the challenged transaction rendered them incapable of making an impartial decision regarding whether to institute litigation concerning the transaction. The high court rejected the possibility that "any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' by directors, or some other form of sterilizing influence upon them," explaining that "[w]ere that so, the demand requirements of our law

22

would be meaningless, leaving the clear mandate of Chancery Rule 23.1 devoid of its purpose and substance." *Aronson*, 473 A.2d at 814.

The Delaware Supreme Court held instead that when considering demand futility in this scenario, the trial court "must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* The first of the two inquiries examines "the independence and disinterestedness of the directors" with respect to the transaction being challenged. *Id.* "Certainly, if this is an 'interested' director transaction, such that the business judgment rule is inapplicable to the board majority approving the transaction, then the inquiry ceases." *Id.* at 815. Under those circumstances, the defendant directors face sufficient risk from a lawsuit challenging the transaction they approved for demand to be futile. By contrast, if a disinterested and independent board majority had approved the underlying transaction, then the business judgment rule presumptively would apply, protecting the directors and their decision.

The *Aronson* inquiry did not stop there, because the Delaware Supreme Court anticipated that there could be situations where a disinterested and independent majority made the decision, and yet the business judgment rule did not apply. *See id.* at 812–13. The Delaware Supreme Court therefore instructed the trial court to conduct a second inquiry by examining whether the plaintiff "ha[d] alleged facts with particularity which, taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment." *Id.* at 815. If the business judgment rule protected the

underlying transaction, then demand would not be futile, and the Rule 23.1 motion would be granted. *Id.* at 812. If a reasonable doubt existed that business judgment rule protected the underlying transaction, then the directors could face a sufficient threat of liability from the litigation that demand would be futile. As the Delaware Supreme Court explained, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Id.* at 815.

Because the *Aronson* test addressed a situation where the same board that would consider a demand had made the decision being challenged in the derivative suit, it did not translate easily to other situations, such as cases where the board had not acted or where the board's membership had changed. In *Rales,* the Delaware Supreme Court confronted a board whose members had not participated in the underlying decision challenged by the derivative action, and therefore "the test enunciated in [*Aronson*] . . . [was] not implicated." 634 A.2d at 930. In response, the Delaware Supreme Court framed a second and more comprehensive demand futility standard that asked "whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

The *Rales* court explained that the decision to respond to a litigation demand involves a two-step process. "First, the directors must determine the best method to inform themselves of the facts relating to the alleged wrongdoing . . . ." *Id.* at 935. "If a factual investigation is required, it must be conducted reasonably and in good faith." *Id.* (footnote omitted). "Second, the board must weigh the alternatives available to it, including the advisability of implementing internal corrective action and commencing legal proceedings." *Id.* "In carrying out these tasks, the board must be able to act free of personal financial interest and improper extraneous influences." *Id.*

Under *Rales*, a director cannot exercise independent and disinterested business judgment regarding a litigation demand, free of personal financial interest and improper extraneous influences, if the director is either interested in the alleged wrongdoing or not independent of someone who is. In order to create a reasonable doubt that a director is disinterested, a derivative plaintiff must plead particularized facts to demonstrate that a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders" or, conversely, that "a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* at 936 (citations omitted). In this latter situation, "a director cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.* In order to create a reasonable doubt that a director is independent, "a plaintiff can plead facts showing a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's

25

ability to judge the matter on its merits." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017).

A decision to implement internal corrective action or institute litigation could have a materially detrimental impact on a director. As under *Aronson*, "the mere threat of personal liability . . . , standing alone, is insufficient." *Rales*, 634 A.2d at 936 (quoting *Aronson*, 473 A.2d at 815). A disqualifying interest exists when "the potential for liability is not 'a mere threat' but instead may rise to a 'substantial likelihood.'" *Id.* (citing *Aronson*, 473 A.2d at 815). To plead that a director faces a substantial risk of liability, a plaintiff does not have to demonstrate a reasonable probability of success on the claim. In *Rales*, the Delaware Supreme Court rejected such a requirement as "unduly onerous." *Id.* at 935. The plaintiffs need only "make a threshold showing, through the allegation of particularized facts, that their claims have some merit." *Id.* at 934 (citing *Aronson*, 473 A.2d at 811–12). This standard recognizes that the purpose of the particularity requirement is not to prevent derivative actions from going forward, but rather "to ensure only derivative actions supported by a reasonable factual basis proceed." *In re Dow Chem. Co. Deriv. Litig.,* 2010 WL 66769, at *6 (Del. Ch. Jan. 11, 2010).

> The Delaware Supreme Court envisioned that the *Rales* test would be used
>
> in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation.

*Rales*, 634 A.2d at 934 (footnotes omitted). Conceptually, however, the *Rales* test supersedes and encompasses the *Aronson* test, making the *Aronson* test a special

26

application of *Rales*.[2] The *Aronson* and *Rales* tests both ultimately focus on the same inquiry, *i.e.*, whether "the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith." *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007). The *Rales* test asks the question generally. As part of that general inquiry, it considers whether a director could be interested in the outcome of a demand because the director would face a substantial risk of liability if litigation were pursued. The *Aronson* test examines one specific type of litigation that could trigger the latter concern: whether the directors face a substantial threat of liability from litigation challenging a transaction that they themselves approved.

---

[2] *See Buckley Family Tr. v. McCleary*, 2020 WL 1522549, at *9 (Del. Ch. Mar. 31, 2020) ("This court has commented on many occasions that the *Aronson* and *Rales* tests look different but they essentially cover the same ground."); *Park Empls.' & Ret. Bd. Empls.' Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597, at *5 (Del. Ch. Apr. 18, 2017) ("The analyses in both *Rales* and *Aronson* drive at the same point; they seek to assess whether the individual directors of the board are capable of exercising their business judgment on behalf of the corporation."); *In re Wal-Mart Stores, Inc. Del. Deriv. Litig.*, 2016 WL 2908344, at *11 (Del. Ch. May 13, 2016) ("[T]he *Rales* test encompasses all relevant aspects of the *Aronson* test."); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 n.131 (Del. Ch. 2015) ("[O]ur jurisprudence would benefit . . . from the adoption of a singular test to address the question of demand futility."); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("[T]he *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination"), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE); *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry . . . . Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 11.03(c)(4)(ii), at 11-113 (2019) ("From this perspective, one might argue that the current state of this area of the law is conceptually inverted; *i.e.*, that it would be both simpler and more direct to regard the original *Aronson* analysis as a subpart of the more generally applicable and consistently relevant test set forth in *Rales*. Indeed, recent decisional law seems to be trending incrementally toward a recognition of and preference for the more efficient utility of the *Rales* analysis.").

This case illustrates how *Rales* and *Aronson* overlap. The fundamental question presented by the defendants' Rule 23.1 motion is whether the Demand Board could have validly considered a litigation demand. *See* Ct. Ch. R. 23.1. The complaint challenges the Company's handling of its financial statements over multiple years, during which time four members of the Demand Board served on the Company's board. Three of them were members of the Audit Committee who made a series of decisions during this time period, including decisions to approve the Company's financial statements for purposes of its Form 10-Ks, determinations regarding the adequacy of the Company's internal controls, determinations regarding director independence and financial expertise, and decisions regarding related-party transactions. Technically, because less than "a majority of the directors making the decision have been replaced," *Rales,* 634 A.2d at 934, *Aronson* would govern.

The complaint is not framed, however, as an *Aronson*-style lawsuit that challenges a specific transaction or a particular decision. The complaint instead alleges that there were persistent problems with the Company's system of financial oversight over a prolonged period, leading ultimately to the Company suffering harm. The core theory is a duty of oversight claim. *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). A *Caremark* claim is conceptualized as flowing from an overarching failure by the

28

directors to take the action necessary to protect the corporation, so the more generalized *Rales* standard is routinely applied.[3]

This decision applies *Rales* to evaluate demand futility for purposes of the *Caremark* claim. When doing so, this decision gives weight to the fact that Lewin, Yu, Chen, and CEO Hu were key corporate decision-makers during the multi-year timeline that ultimately led to the oversight problems at the Company.

### 2. Count I

Count I asserts that the defendants "breached their fiduciary duties by willfully failing to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting." Compl. ¶ 293. "The board of a Delaware corporation has a fiduciary obligation to adopt internal information and reporting systems that are 'reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with

---

[3] *See, e.g., City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) ("For alleged violations of the board's oversight duties under *Caremark*, the test articulated in *Rales v. Blasband* applies to assess demand futility."); *Wood*, 953 A.2d at 140 ("The [*Rales*] test applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the Board's oversight duties."); *In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578, at *7 (applying the *Rales* test for demand futility to director oversight claims); *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (same); *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at 6* (Del. Ch. Oct. 18, 2016) (same); *Melbourne Mun. Firefighter's Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *6 (Del. Ch. Aug. 1, 2016) (same); *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (same); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12, 2011) (same); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *12 (Del. Ch. Jan. 11, 2010) (same); *Desimone v. Barrows*, 924 A.2d 908, 927–28 (Del. Ch. 2007) (same).

29

law and its business performance.'" *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *18 (Del. Ch. May 21, 2013) (quoting *Caremark*, 698 A.2d at 970). "Failing to make that good faith effort breaches the duty of loyalty and can expose a director to liability." *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019).

Directors face a substantial threat of liability under *Caremark* if "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. For both potential sources, "a showing of bad faith conduct . . . is essential to establish director oversight liability." *Id.* A plaintiff establishes bad faith by "showing that the directors knew that they were not discharging their fiduciary obligations." *Id.* "Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a *sustained* or *systemic* failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability." *Caremark*, 698 A.2d at 971 (emphasis added).

For purposes of *Caremark*'s first path, "a director may be held liable if she acts in bad faith in the sense that she made no good faith effort to ensure that the company had in place any 'system of controls.'" *Marchand*, 212 A.3d at 822. "[D]irectors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources. But *Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to put in place a reasonable

30

board-level system of monitoring and reporting." *Id.* If a corporation suffers losses caused by the directors' failure "to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists," then the directors can be held liable. *Caremark*, 698 A.2d at 970.

A plaintiff can state a *Caremark* claim by alleging that "the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation." *Guttman*, 823 A.2d at 507. The mere existence of an audit committee and the hiring of an auditor does not provide universal protection against a *Caremark* claim. *Compare Ash v. McCall*, 2000 WL 1370341, at *15 n.57 (Del. Ch. Sept. 15, 2000) (concluding that audit committee and independent auditor were "some evidence" that the requisite systems existed), *with Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013) (concluding that despite existence of audit committee and independent auditor, the company "had no *meaningful* controls in place").

The complaint alleges facts that support an inference that the Company's Audit Committee met sporadically, devoted inadequate time to its work, had clear notice of irregularities, and consciously turned a blind eye to their continuation. As detailed in the Factual Background, the Company suffered from pervasive problems with its internal controls, which the Company acknowledged in March 2014 and pledged to correct. Yet after making that commitment, the Audit Committee continued to meet only when

31

prompted by the requirements of the federal securities laws. When it did meet, its meetings were short and regularly overlooked important issues.

For example, in May 2014, the Audit Committee convened for the first time after disclosing two months earlier that its "disclosure controls and procedures were not effective as of December 31, 2013, due to a material weakness." Compl. ¶ 112. The meeting lasted just forty-five minutes. During that time, the Audit Committee purportedly reviewed new agreements governing the Company's related-party transactions with Kandi USA. Neither the agreements nor the review procedures were produced in response to the plaintiff's demand for books and records, supporting a reasonable inference that they either did not exist or did not impose meaningful restrictions on the Company's insiders. Three weeks later, the Audit Committee purportedly reviewed and approved a new policy that management had prepared governing related-party transactions. The Company also did not produce this policy in response to the plaintiff's demand for books and records, supporting a reasonable inference that it too either did not exist or did not impose meaningful restrictions on the Company's insiders.

The Audit Committee did not meet again for almost an entire year. The committee next convened in March 13, 2015, spurred by the need to review the Company's financial results for purposes of the 2014 10-K. The meeting lasted only fifty minutes. During this time, the Audit Committee ostensibly discussed the financial results and purportedly approved a new policy that management had prepared to govern related-party transactions involving the Joint Venture. It is reasonable to infer that the policy did not place meaningful restrictions on management and that the Audit Committee failed to establish its own

32

monitoring system for related-party transactions. It is also reasonable to infer that during this fifty-minute meeting, the Audit Committee could not have fulfilled its responsibilities under the Audit Committee Charter for purposes of nearly a year's worth of transactions.

Once again, the Audit Committee did not meet for almost an entire year. The committee next convened on March 7, 2016, again spurred by the need to review the Company's financial results for purposes of the 2015 10-K. During a meeting that lasted just thirty minutes, the Audit Committee discussed the financial results and reviewed the related-party transactions that management had identified, which ostensibly consisted of minimal transactions with Services Company involving battery sales. Just two weeks later, and one week after the Company had filed its 2015 10-K, the Audit Committee acted by written consent on March 22 to ratify a very different description of the related-party transactions between the Company and the Service Company, this time totaling over $42 million. In the same written consent, the Audit Committee authorized management to engage in related-party transactions with the Service Company during the remainder of 2016. It is reasonable to infer that during this thirty-minute meeting, the Audit Committee could not have fulfilled its responsibilities under the Audit Committee Charter for purposes of a year's worth of transactions. It is also reasonable to infer from the contrast between the Audit Committee meeting and the action by written consent that the Audit Committee was not adequately overseeing the Company's related-party transactions and did not have its own system in place for monitoring this critical aspect of the Company's finances.

Just one month later, on April 12, 2016, the Audit Committee relied on management's determination that it was necessary to replace AWC. Whether the Audit

33

Committee should have acted earlier to replace AWC remains an open question, particularly given the red flags that AWC had no other clients and the problems with AWC's prior audits. For present purposes, it is reasonable to infer that the Audit Committee deferred to management on the question of replacing the Company's outside auditor and did not engage in independent oversight of this important role.

These chronic deficiencies support a reasonable inference that the Company's board of directors, acting through its Audit Committee, failed to provide meaningful oversight over the Company's financial statements and system of financial controls. Despite identifying Yu and Lewin as Audit Committee Financial Experts in 2015, the Company later disclosed in the 2016 10-K that it lacked personnel with sufficient expertise on US GAAP and SEC disclosure requirements for equity investments and related-party transactions. The directors charged with implementing a system to oversee the Company's financial reporting thus lacked the expertise necessary to do so all along. Instead, the Audit Committee deferred to management, which dictated the policies and procedures for reviewing related-party transactions and hired and fired the Company's auditor, even though management's actions suggested that it was either incapable of accurately reporting on related-party transactions or actively evading board-level oversight.

In response, the defendants argue that the Company had the trappings of oversight, including an Audit Committee, a Chief Financial Officer, an internal audit department, a code of ethics, and an independent auditor. They rely on this court's holding in *General Motors* that a plaintiff cannot meet its *Caremark* burden by pleading that board-level monitoring systems existed but that they should have been more effective. *See In re Gen.*

34

*Motors Co. Deriv. Litig.*, 2015 WL 3958724 (Del. Ch. June 26, 2015). The facts of this case are distinguishable from those of *General Motors*.

In *General Motors*, the plaintiffs brought *Caremark* claims against the company's directors after the company recalled 28 million vehicles due to faulty ignition switches. *Id.* at *2. The *General Motors* plaintiffs faced a *Caremark* catch-22 because their pre-suit investigation demonstrated that the board was exercising "*some* oversight." *Id.* at *15. For example, the board regularly reviewed the company's risk management structure, identified the top risks facing the company's business, and received presentations on product safety and quality. *Id.* The plaintiffs therefore had to argue that the board "failed to implement a reporting system which would have apprised them specifically of serious injuries and deaths resulting from safety defects." *Id.* at *11. They alternatively argued that the General Motors board failed to monitor any reporting systems that did exist. *Id.* This court held that the plaintiffs could not plead that the directors faced a substantial likelihood of *Caremark* liability by arguing that the board "should have[] had a *better* reporting system." *Id.* at *15.

The allegations in this case depict a board that was far less active than the directors in *General Motors*. The complaint in this case depicts directors who acted similarly to their counterparts in *Marchand*, who failed "to make a good faith effort—*i.e.,* try—to put in place a reasonable board-level system of monitoring and reporting." *Marchand*, 212 A.3d at 821. The allegations in this case support inferences that the board members did not make a good faith effort to do their jobs. The Audit Committee only met when spurred by the requirements of the federal securities laws. Their abbreviated meetings suggest that they

35

devoted patently inadequate time to their work. Their pattern of behavior indicates that they followed management blindly, even after management had demonstrated an inability to report accurately about related-party transactions.

An Audit Committee may of course rely in good faith upon reports by management and other experts. *See* 8 Del. C. § 141(e). In doing its job, the members of an Audit Committee will necessarily rely on management. But *Caremark* envisions some degree of board-level monitoring system, not blind deference to and complete dependence on management. The board is obligated to establish information and reporting systems that "allow management and the board, *each within its own scope*, to reach informed judgments concerning both the corporation's compliance with law and its business performance." *Caremark*, 698 A.2d at 959 (emphasis added)).

The complaint's allegations support a pleading-stage inference that the board never established its own reasonable system of monitoring and reporting, choosing instead to rely entirely on management. The Company could have produced documents in response to the plaintiff's Section 220 demand that would have rebutted this inference. The absence of those documents is telling because "[i]t is more reasonable to infer that exculpatory documents would be provided than to believe the opposite: that such documents existed and yet were inexplicably withheld." *In re Tyson Foods, Inc.*, 919 A.2d 563, 578 (Del. Ch. 2007). The documents that the Company produced indicate that the Audit Committee never met for longer than one hour and typically only once per year. Each time they purported to cover multiple agenda items that included a review of the Company's financial performance in addition to reviewing its related-party transactions. On at least two

36

occasions, they missed important issues that they then had to address through action by written consent. The plaintiff is entitled to the inference that the board was not fulfilling its oversight duties.

The defendants additionally argue that even if the directors failed to fulfill their oversight duties, they should not be subject to liability because the Company did not suffer harm as a result. The defendants observe that the March 2017 restatement had no effect on the Company's net income, and they point out that this argument carried significant weight in the federal securities action, where it undercut the inference of fraud. *In re Kandi Techs. Gp., Inc. Sec. Litig.*, 2019 WL 4918649, at *8.

For purposes of this litigation, the defendants' observation is misplaced. "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). In the absence of quantifiable damages to net income, defendants are "still liable for damages incidental to their breach of duty." *Id.* The plaintiff claims that the Company suffered incidental damages that include "costs and expenses incurred with the restatements, significant reputational harm in the markets, the defense of several lawsuits filed against the Company for violations of federal securities law, and the defense of an action commenced by Plaintiff pursuant to 8 *Del. C.* § 220." Compl. ¶ 12. At the pleading stage, this allegation is sufficient to support a claim for relief.

Given the persistent and prolonged problems at the Company, CEO Hu, Lewin, Yu, and Chen face a substantial likelihood of liability under *Caremark* for breaching their duty of loyalty by failing to act in good faith to maintain a board-level system for monitoring

37

the Company's financial reporting. The defendants who face a substantial likelihood of liability constitute a majority of the Demand Board. Accordingly, the Demand Board lacks a disinterested and independent majority that could have considered a demand, rendering demand futile. As to Count I, the motion to dismiss is denied.

### 3. Count II

Count II asserts a claim for unjust enrichment. The plaintiff alleges that the officer defendants (CEO Hu and CFOs Zhu, Wang, and Mei) received excessive compensation because the Company's inaccurate financial statements overstated its performance. The complaint also cited the compensation received by the directors, but at oral argument, the plaintiff's counsel clarified that Count II does not seek to recover damages from the Company's non-officer directors for the compensation they received as directors. Count II only seeks damages based on the excessive compensation paid to CEO Hu and CFOs Zhu, Wang, and Mei, but it seeks to hold all of the defendants jointly and severally liable for the resulting damages.

One approach would be to use *Aronson* to analyze whether demand on Count II is futile. Four of the six members of the Demand Board approved the officer defendants' compensation, so technically *Aronson* could apply. Indeed, *Aronson* would logically apply if the plaintiff was arguing that the members of the board breached their fiduciary duties when approving the officers' compensation.

The plaintiff, however, is making a different argument. The plaintiff contends that the oversight claim articulated in Count I had a secondary consequence of inflating the Company's financial results, leading to unjust enrichment for the officer defendants who

38

were compensated based on the misstated results. The unjust enrichment claim in Count II is thus properly conceived as a form of additional damages dependent on the plaintiff proving the oversight claim asserted in Count I.

The demand futility analysis for purposes of Count II thus necessarily treads the same path as the demand futility analysis for Count I. To evaluate a demand to assert the claim posited in Count II, the Demand Board would have to investigate and then assert litigation based on the breaches of the duty of oversight that are the subject of Count I. This decision has already held that four of the six members of the Demand Board—CEO Hu, Lewin, Yu, and Chen—are interested for purposes of a litigation demand involving the conduct underlying Count I because they face a substantial threat of liability for the oversight claims asserted in Count I. The unjust enrichment claim asserted in Count II would implicate the same conduct. For the same reason, demand is futile.

## B.     Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court applying Delaware law (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

Although the defendants purportedly moved separately pursuant to Rule 12(b)(6), they did not offer any independent arguments for dismissal under that rule. For purposes

of Count I, the analysis under Rule 23.1 is dispositive. "The standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6), and a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim.'" *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009); *see also China Agritech*, 2013 WL 2181514, at \*24 ("A complaint that pleads a substantial threat of liability for purposes of Rule 23.1 'will also survive a 12(b)(6) motion to dismiss.'" (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008))).

This decision concluded that demand was futile for purposes of Count II because of its interrelationship with Count I. It would not be duplicative, therefore, to analyze the unjust enrichment claim that appears in Count II on the merits. The defendants, however, did not engage in any discussion of the unjust enrichment claim, nor did the plaintiff. This decision will not discuss the claim either, except to reiterate that as framed by the plaintiff at oral argument, it depends on the plaintiff proving the *Caremark* claim alleged in Count I, at which point the plaintiff maintains that the officer defendants would have received excessive compensation that would be subject to a claim for unjust enrichment.

### III.    CONCLUSION

The defendants' motions to dismiss under Rules 23.1 and 12(b)(6) are denied. The parties will confer regarding a schedule for moving forward with the action and file a status report within thirty days.